ANDRÉ BIROTTE JR.
United States Attorney
ROBERT E. DUGDALE
Assistant States Attorney
Chief, Criminal Division
KERI CURTIS AXEL (Cal. Bar No. 186847)
JEAN-CLAUDE ANDRÉ (Cal. Bar No. 213538)
Assistant United States Attorneys
    1200 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-5421/0705
        Facsimile: (213) 894-6536
        E-mail: keri.axel@usdoj.gov
                jean-claude.andre@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | ) | NO. CR 10-15-RGK |
|---|---|---|
| Plaintiff, | ) | GOVERNMENT'S SENTENCING MEMORANDUM REGARDING, AND OPPOSITION TO SENTENCING POSITION OF, DEFENDANT SAMUEL KLEIN; |
| v. | ) | |
| SAMUEL KLEIN and ZIPORA KLEIN, | ) | |
| Defendants. | ) | DECLARATIONS OF KELLY LOWER,  JEROME JENKINS, JESUS QUEZADA AND CHRISTOPHER HODGE IN SUPPORT FILED SEPARATELY AND UNDER SEAL |
| | ) | |
| | ) | Hearing Date: July 18, 2011 |
| | ) | Hearing Time: 10:00 a.m. |

/ / /

/ / /

1    The government, having already submitted its objections to the PSR and

2    Sentencing Guidelines calculations for defendant SAMUEL KLEIN ("defendant")

3    on May 11, 2011, hereby submits its sentencing memorandum regarding, and

4    opposition to the sentencing position of, defendant.  For the reasons set forth

5    below, the government concurs in the factual findings of the United States

6    Probation Office, but maintains its view that the Guidelines calculations set forth in

7    the government's May 11, 2011, objections are correct, and recommends that

8    defendant be sentenced to a low-end Guidelines term of 87 months in prison.

9    This sentencing memorandum is supported by the Declarations of

10   Immigration and Customs Enforcement Special Agent Jesus Quezada, Department

11   of Education Special Agent Christopher Hodge, Internal Revenue Service Special

12   Agent Kelly Lower, and Internal Revenue Service Special Agent Jerome Jenkins.

13   Because all of the declarations attach either tax analysis and confidential tax

14   information, or personal identifiers of witnesses and Klein family members, they

15   have been filed under seal.

16   Dated: June 29, 2011                    Respectfully submitted,

17                                           ANDRÉ BIROTTE JR.
                                             United States Attorney
18
19                                           ROBERT E. DUGDALE
                                             Assistant United States Attorney
20                                           Chief, Criminal Division

21

22                                            /s/ Keri Curtis Axel
                                             KERI CURTIS AXEL
23                                           JEAN-CLAUDE ANDRÉ
                                             Assistant United States Attorneys
24
25                                           Attorneys for Plaintiff
                                             United States of America
26

27

28

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

I.   FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.   The Kleins's Scheme to Defraud the Government . . . . . . . . . . . . . . 3

II.  THE SENTENCING GUIDELINES  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    A.   The Government Properly Calculated
        Defendant's Total Offense Level at 29
        and Guidelines Range at 87 to 103 Months  . . . . . . . . . . . . . . . . . . . 8

    B.   Tax Offense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        1.   The Probation Office Properly Determined that
            Defendant's Tax Loss Is $757,599.72  . . . . . . . . . . . . . . . . . . 10

            a.   The Government's Tax Calculation
                Complies With the Sentencing
                Guidelines . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

            b.   The Monies the Kleins Took From
                Sandor Bartok In Violation of Law,
                As Well As the Monies Received for
                Services Allegedly Rendered Him,
                Are Taxable  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

                i.   Factual Background re Sandor Bartok . . . . . . . . 16

                ii.  The Monies the Kleins Took From Sandor Bartok
                    in Violation of Law Represent Taxable Income   17

                iii. The Monies the Kleins Received for Alleged
                    Services Provided to Bartok By the Defunct
                    Genesee Royale Represent Taxable Income. . . . 18

        2.   The Probation Office Properly Applied
            USSG § 2T1.1(b)(1)'s Two-Level Enhancement . . . . . . . . . . 18

# TABLE OF CONTENTS (CONTINUED)

PAGE

3.     The Probation Office Properly Applied USSG § 2T1.1(b)(2)'s Two-Level Enhancement for Use of Sophisticated Means . . . . . . . . . . . . . . . . . . . . . . . 20

4.     USSG § 3B1.3's Enhancement for Use of a Special Skill Is Applicable . . . . . . . . . . . . . . . . . . . . . . . . . . 26

5.     USSG § 3C1.1's Enhancement for Obstruction of Justice Is Applicable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

      a.    <u>The Kleins's Fraudulent 2007 Tax Return</u> . . . . . . . . . . 27

      b.    <u>Defendant's Perjurious Declaration to This Court</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

C.    <u>Immigration Offense</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

1.     The Probation Office Properly Applied USSG § 2L2.1(b)(2)(C)'s Nine-Level Enhancement for Preparation of Over 100 Fraudulent Documents . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

2.     USSG § 3B1.3's Abuse of Trust Enhancement Is Applicable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

D.    <u>Education Fraud Offense</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

E.    <u>Defendant Is Not Entitled to a Reduction for Acceptance of Responsibility</u> . . . . . . . . . . . . . . . . . . . . . . . . . 35

III.    SECTION 3553(A) FACTOR ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . 38

V.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

iv

# TABLE OF AUTHORITIES

**FEDERAL CASES**                                                                    **PAGE(S)**

California Cosmetology Coalition v. Riley,
        110 F.3d 1454 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

United States v. Badmus,
        325 F.3d 133 (2nd Cir. 2003)    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

United States v. Berlier,
        948 F.2d 1093 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

United States v. Bragg,
        582 F.3d 965 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

United States v. Charlesworth,
        217 F.3d 1155 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

United States v. Clear,
        112 Fed. Appx. 429, 431 (6th Cir. 2004)    . . . . . . . . . . . . . . . . . . . . . . . . . . 24

United States v. Dota,
        33 F.3d 1179 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

United States v. Johnson,
        577 F.2d 1304 (5th Cir. 1978)    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

United States v. Langer,
        618 F.3d 1044 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

United States v. Marashi,
        913 F.2d 724 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

United States v. Marin-Cuevas,
        147 F.3d 889 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

United States v. Martinez-Gonzalez,
        962 F.2d 874 (9th Cir.  1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

United States v. McCormac,
        309 F.3d 623 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

v

## TABLE OF AUTHORITIES (CONTINUED)

**FEDERAL CASES**                                                    **PAGE(S)**

United States v. Miller,
    991 F.2d 552 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

United States v. Ramos,
    923 F.2d 1346 (9th Cir. 1991), . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

United States v. Romero-Rendon,
    220 F.3d 1159 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

United States v. Roush,
    466 F.3d 380 (5th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

United States v. Rutledge,
    28 F.3d 998 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

United States v. Scrivener,
    189 F.3d 944 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

United States v. Spencer,
    178 F.3d 1365 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

United States v. Tulaner,
    512 F.3d 576 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

United States v. Vonner
    516 F.3d 382 (6th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

United States v. Yip,
    592 F.3d 1035 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

**FEDERAL STATUTES AND REGULATIONS**

18 U.S.C. § 1001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 1546(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 30

18 U.S.C. § 1623(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

18 U.S.C. §3553(a)(1),(a)(2)(A),þ(a)(2)(B) . . . . . . . . . . . . . . . . . . . . . . . . . 35, 37

vi

**TABLE OF AUTHORITIES (CONTINUED)**

**PAGE(S)**

**FEDERAL STATUTES AND REGULATIONS**

26 C.F.R. § 1.61-14 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

26 U.S.C. § 7206(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 27, 28


**REFERENCE AND LAW REVIEW MATERIALS**

O'Malley et al., <u>Federal Jury Practice and Instructions,</u>

   § 67.19 (6th ed. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Stephanos Bibas, <u>White Collar Plea Bargaining and Sentencing After Booker</u>, 47

   Wm. & Mary L. Rev. 721 (2005)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39


**CALIFORNIA CASES**

<u>Bank of America v. Angel View Crippled Children's Foundation</u>,
   72 Cal.App.4th 451 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

<u>Bernard v. Foley</u>,
   9 Cal.4th 794 (2006)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

<u>Estate of Shinkle</u>,
   97 Cal.App.4th 990 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17


**CALIFORNIA STATUTES AND REGULATIONS**

Cal. Code of Regulations §87227  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17-18

Cal. Prob. Code § 21350 (a)(4), (5) ) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

## GOVERNMENT'S SENTENCING POSITION

Defendant SAMUEL KLEIN's ("defendant") guilty pleas to tax fraud, visa fraud, and education benefits fraud alone establish that he will tell any governmental authority whatever he thinks will benefit him regardless of the truth. The evidence obtained during the government's investigation of those offenses not only confirms that basic proposition but in fact establishes that defendant's willingness to lie and cheat and the pervasiveness of his frauds are limitless. Indeed, it is precisely because defendant's tax fraud went on for years; because defendant prepared and submitted to immigration authorities not just a handful, but well over 1,000 fraudulent visa applications; because defendant prepared and submitted to the Department of Education not just one, but three fraudulent federal student aid applications; and because defendant has been willing to continue to misrepresent material matters both during the investigation underlying this case and the actual prosecution of this case that defendant now faces an advisory Guidelines sentence of 87 to 108 months.

Instead of appropriately accepting responsibility for the full scope of his conduct, defendant has elected to file a sentencing position in which he (1) "objects" to almost every inculpatory fact described in the PSR other than the bare element-satisfying facts to which he stipulated during his guilty pleas and (2) objects to literally every one of the Probation Office's and the government's Guidelines calculations.[1]  With the exception of his objections to the government's tax loss calculation and the enhancement for preparing and submitting more than 100 fraudulent immigration documents, defendant has not actually offered

---

[1]  For example, even though the PSR was based on "investigative material" provided by the government and the Probation Officer's synthesis of it (PSR ¶ 14), defendant "objects to any offense conduct outside of the plea agreement" (Obj. 8), effectively asserting that the Probation Office cannot get a single fact straight even though he has, in most instances, offered nothing to controvert the PSR.

evidence to contradict the numerous facts to which he "objects," as he is required to do to overcome the PSR.[2]   The little evidence he does offer to contradict the Probation Office's and the government's tax loss calculations and the enhancement for preparing and submitting more than 100 fraudulent immigration documents focuses, as the government will explain below, on legally irrelevant inquiries and therefore simply misses the point.  Finally, defendant's legal "objections" to the Probation Office's and the government's remaining Guidelines calculations are frivolous as either foreclosed by clear precedent or based on a plainly incorrect reading of the Guidelines.

At bottom, defendant's sentencing position is nothing more than a long-winded rant memorializing what he wishes the facts were and what he wishes the law provided.  Further and perhaps most egregiously, defendant's pattern of lies continues through even these very sentencing proceedings, as defendant has submitted to this Court a patently false sworn declaration in support of the

---

[2]  Ninth Circuit law has been clear for over a decade that the government and this Court may rely on the PSR's discussion of that conduct without further supporting evidence because PSRs are sufficiently reliable and, absent evidentiary controversion, carry the government's burden.  See, e.g., United States v. Romero-Rendon, 220 F.3d 1159, 1161-63 (9th Cir. 2000) (affirming sentence, which relied solely on the PSR prepared by the probation officer, because there was "no discernable reason why the officer who prepared the PSR should be dishonest," especially considering that the listed sources in the probation officer's report were all "state and federal government agencies"); United States v. Charlesworth, 217 F.3d 1155, 1160-61 (9th Cir. 2000) (concluding the information in the PSR was sufficient because defendant never offered any evidence to contradict the PSR, arguing instead "that the government failed to sustain its burden of proof"); see also, e.g., United States v. Langer, 618 F.3d 1044, 1048 (9th Cir. 2010) (PSR addendum relying on rap sheet sufficient where, despite defendant's objection, defendant "introduced no contradicting evidence"); United States v. Marin-Cuevas, 147 F.3d 889, 895 (9th Cir. 1998) (PSR sufficient despite defendant's objection "[b]ecause the only evidence before the sentencing court was the Presentence Report." (emphasis added)).

sentencing position of his wife, co-defendant Zipora Klein, in an effort to trick this Court into giving her a probationary sentence.

As the evidence demonstrates, defendant's serial lies (and the circumstances surrounding them) and defendant's disrespect for this country's governmental institutions — including this Court — fully support the government's Guidelines calculations and fully merit the government's recommended 87-month sentence.

I.   **FACTS**

   A.   **The Kleins' Scheme to Defraud the Government**

Defendant, an accountant and California registered tax preparer, and his wife were charged with various government fraud offenses, including filing fraudulent tax returns for tax years 2003 through 2007, structuring financial institution transactions so as to avoid Treasury reporting requirements (defendant's wife only), immigration document fraud (defendant only), and education benefits fraud (defendant only).  Pursuant to a written plea agreement, defendant pled guilty on the third day of the trial on these charges to one of each of the substantive fraud counts against him: (1) Count Five, subscribing to a fraudulent income tax return (for tax year 2006) in violation of 26 U.S.C. § 7206(1); (2) Count Thirteen, preparation and submission of a fraudulent immigration document to immigration authorities in violation of 18 U.S.C. § 1546(a); and (3) Count Sixteen, false statement in a federal education benefits application, in violation of 18 U.S.C. § 1001.[3]

As set forth in the factual basis of his plea agreement, defendant admitted that on or about May 1, 2007, he and his wife reported a total income of only $138,867 on line 22 of their 2006 IRS Form 1040 income tax return, knowing that their total income exceeded $138,867, and that under-reporting their total income

---

[3] Defendant agreed to waive appeal of any sentence up to 63 months.  (Plea Agreement ¶ 21.)

was material to the IRS's ability to determine their true tax liability.  Defendant's knowing preparation of and subscription to a fraudulent tax return for 2006, however, was just one part of his and his wife's larger scheme to defraud just about any governmental agency they crossed, but in particular, the IRS, as defendant effectively admitted when he stipulated in his plea agreement that his under-reported income from 2003 through 2005 was relevant conduct to his 2006 offense. (Plea Agreement ¶ 17).

The Kleins' consistently under-reported their income to the IRS from at least 2003 through 2007 so as to fund a lifestyle that includes living in a nearly $3 million home (PSR ¶ 111) and having paid household help in excess of 45 hours per week (Lower Decl. Ex. 51).[4]  This under-reported income came from primarily two sources.

First, from at least 2002 onward, defendant operated a business called Smartax Associates or Startax (hereinafter referred to collectively as, "Smartax"), from which he provided tax preparation and immigration document preparation services to clients.  (PSR ¶ 15.)  The business was, as the trial and other evidence established, permeated with fraud.  Defendant repeatedly prepared false visa petitions seeking authorization for various Israeli nationals to serve as religious workers in the United States.  (PSR ¶¶ 23, 25.)  These Israelis were not religious workers and had no job positions with the religious institutions that were purportedly hiring them, as defendant effectively admitted in connection with his guilty plea to Count Thirteen, which involved the preparation of such fraudulent

---

[4]  Although defendant and his wife now admit ownership of their personal residence since 1998 (PSR ¶ 111; see also Zipora Klein PSR ¶ 82) and in fact have used it to secure a $1 million bond in this case, defendants previously have testified under oath that defendant bought the home but subsequently transferred it away to absolve a debt (Lower Decl., Ex. 68 at K078316-319, Ex. 69 at K078433), Ex. 74 at K078482-89).

visa documents for Israeli immigrant N. Paz.  (PSR ¶¶ 23-24; Plea Agreement ¶ 15.)  In addition, the addresses associated with the overwhelming majority of defendant's false petitions were not the addresses of the aliens or religious institutions (as they should be), but New York addresses associated with defendants' children.[5]  (PSR ¶ 23, 25; Declaration of Jesus Quezada ¶ 2, Exs. C through H).

Second, from 2003 to 2007, the Kleins had at least 10 residential real estate properties from which they generated income, including one in Israel.  (PSR ¶ 19.)  Throughout the relevant tax years, they regularly changed the ownership of the properties, creating Limited Liability Companies (LLCs) owned by fictitious individuals, and effecting transfers of the properties to family members and nominees.  (PSR ¶ 19; Jenkins Decl. Ex. A.)  But the Kleins continued to control the properties and to collect all the rent from the properties.  (PSR ¶ 19.)  Not only did they fail consistently to claim all of these properties on their tax returns (PSR ¶ 19), they appear also to have committed loan fraud.   (Lower Decl. ¶ 23(d) & Ex. 78 (son-in-law nominee owner admitting to California Franchise Tax Board "FTB" that he was reported as the owner only "for qualification of loans" and "does not have anything to do with the properties").

From 1997 to 2005, the Kleins' efforts to conceal their income took the simple form of failing to file any tax returns with the IRS or California Franchise Tax Board ("FTB") unless prompted to do so by the IRS or FTB.  (PSR ¶ 16; Lower Decl. ¶ 9 & Ex. 28.)  Throughout this period, both IRS and the FTB sent numerous notices prodding the Kleins to file, and most of the Kleins' federal

---

[5] Defendant's claim to have a legitimate purpose for using the New York addresses is controverted by his admission to law enforcement that he intentionally used the New York addresses so that, if "Immigration [came] to look for [the alien], they would look in New York instead of Los Angeles."  ( Quezada Decl. ¶ 3).

returns for this period were not filed until 2005.  (PSR ¶ 16; Lower Decl. ¶ 10 & Exs. 28-29.)  Then, when the Kleins did file, they arbitrarily manipulated their income and expenses; in all instances under-reporting their income.  (PSR ¶ 16; see, e.g., Lower Decl. Exs. 3-12.)

The Kleins were able to so manipulate their income and expenses by, among other things, using at least 15 bank accounts and commingling monies among the accounts.[6]  (PSR ¶ 17; see, e.g., Lower Decl. Ex. 33.)  For example, there was no bank account devoted to Smartax business receipts, or to income from a particular rental property.  (PSR ¶ 17; Lower Decl. ¶ 13.)  Instead, receipts from these disparate activities were commingled among accounts with the Kleins' personal expenses paid from the same accounts.  (PSR ¶ 17; Lower Decl. ¶ 13.)  Defendants also conducted significant aspects of their business dealings and household economy using large amounts of cash.  For example, from 2003 through March

---

[6]  The Kleins also took affirmative steps to avoid declaring income from Smartax.  In 2005, after the IRS required Smartax to catch up on its outstanding corporate tax returns for 2002 and 2003, the Kleins represented to the IRS that the 2003 return was Smartax's final return.  (PSR ¶ 18; Lower Decl. ¶ 5 & Exs. 12, 24.)  Because the Kleins did not want the IRS or the FTB to know that Smartax remained operational, the Kleins caused Smartax to use a different Employer Identification Number ("EIN") on its next tax filing.  (PSR ¶ 18; Lower Decl. ¶¶ 4-8 & Exs. 27, 17-22).  After representing that 2003 was Smartax's final year in operation even though it was still fully operational, the business ceased filing corporate returns until the Kleins became aware of the criminal investigation underlying this case.  (PSR ¶ 19; Lower Decl. ¶ 6.)

Defendant's retort that he "used different EIN numbers because he was filing tax returns for different entities" is both wrong and a non-sequitur.  (Obj. 8.)  First, throughout defendant's use of different EINs, the business did not change: it was a tax preparation/immigration document preparation business located in defendant's 4929 Wilshire Blvd. office space.  (Lower Decl. ¶ 7.)  Further evidencing that it was the same business and that defendant and his wife were simply trying to game the IRS, defendant and his wife kept the same California Employer Identification Number (246-1432-3) on all of the W-2s that they issued themselves throughout this period.  (Lower Decl. ¶ 7.)

2008, defendant's wife, co-defendant Zipora Klein, deposited the overwhelming majority of more than $1.2 million into the Kleins' bank accounts, all in cash deposits that did not exceed $10,000.[7]  (PSR ¶ 17; Lower Decl. Ex. 34; Jenkins Decl. Ex. B.)

All-in-all, the Kleins' tax fraud between tax years 2003 and 2006, resulted in non-reporting of $2,007,782.10 in gross income that was subject to taxation.  (PSR ¶ 22.)  This resulted in a tax loss  to the IRS in the amount of $562,179.02.  (PSR ¶ 22.)

Although not part of the Kleins' scheme to conceal their assets and income from the IRS, defendant's education benefit fraud is further evidence that he will simply make things up when completing a government form on which money depends.  As defendant admitted in the factual basis to his guilty plea to Count Sixteen, on or about April 20, 2006, he submitted a false Free Application for Federal Student Aid ("FAFSA") to the Department of Education ("DOE") to obtain a Pell Grant for his son, L. Klein.  (Plea Agreement ¶ 17; PSR ¶ 26.)  The FAFSA was false, as defendant also admitted, because the document falsely reported, among other things, that he and his wife, co-defendant Zipora Klein, earned only $38,902 from work in 2005 (Declaration of Christopher Hodge ("Hodge Declaration"), Ex. AA) when, in truth and in fact, they earned at least $190,000 according to their own later-filed and fraudulently under-reporting 2005 tax return (Plea Agreement ¶ 17; Lower Decl. Ex. 14; PSR ¶ 26.)  This FAFSA was also false because defendant and his wife claimed that they had a total cash,

---

[7] Defendant joins in his wife's objections to her PSR.  (Obj. 8 n.1.)  The government has responded to the objections of defendant's wife in its sentencing position for her and incorporates those responses here.

savings, and checking account balance of only $2000 when, in fact, it exceeded $83,000.[8]  (PSR ¶ 27.)

Although DOE did not grant L. Klein a Pell Grant in response to the April 2006 FAFSA underlying Count Sixteen, had it done so, the grant would have been $2000.  (Hodge Decl. ¶ 6.)  Moreover, the false April 2006 FAFSA, was not the only false FAFSA that defendant submitted to the DOE.  Defendant had previously filed other false FAFSAs on behalf of his other children, including three in 2001 and 2002 that resulted in granted financial aid.  (PSR ¶ 27; Hodge Decl. ¶¶ (a)-(c).) Notably, in one that defendant signed and submitted in April 2002, for his son, E. Klein, defendant attached a fictitious, never-filed tax return that reported adjusted gross income of approximately $34,000, when the (also fraudulent) 2001 return he and his wife actually filed with the IRS three years later in April 2005 reported adjusted gross income in excess of $90,000.  (Compare Lower Decl. Ex. 23 (return submitted with FAFSA) with Lower Decl. Ex. 8 (filed return).)

/ / /

/ / /

/ / /

_____

[8]  Defendant also represented that the net worth of his and his wife's "investments, including real estate" was $0 (Hodge Decl., Ex. AA at 4) even though they owned at least eight investment properties at that time — seven of which have equity contributing to their current $3,680,083 net worth (PSR ¶¶ 102, 112-20); see also Lower Decl. Ex. 13 at 8-9, 11-14 (acknowledging ownership of six of these properties on 2004 return signed Aug. 10, 2005), Ex. 14 at 7-8, 10-11, 13-14 (same on 2005 tax return signed Aug. 15, 2006), Ex. 15 at 8-9, 11-12, 14-15 (same on 2006 tax return signed May 1, 2007).

## II.     THE SENTENCING GUIDELINES

### A.     The Government Properly Calculated Defendant's Total Offense Level at 29 and Guidelines Range at 87 to 103 Months

The government properly calculated a total offense level of 29, as depicted on pages 7 and 8 the government's May 11, 2011, objections to the PSR and reproduced below:[9]

**Tax offense:**

| | | |
|---|---|---|
| Tax loss more than $400,000 (2003 through 2006) | 20 | [USSG §§ 2T1.1(a)(1), 2T4.1; see USSG § 2T1.1(c)(1)(A); USSG § 2T1.1, cmt. (n.7)] |
| Failure to Identify source of income exceeding $10,000 | +2 | [USSG § 2T1.1(b)(1)] |
| Sophisticated Means | +2 | [USSG § 2T1.1(b)(2)] |
| Special Skill | +2 | [USSG § 3B1.3] |
| Obstruction of Justice | +2 | [USSG § 3C1.1] |
| Adj. Offense Level: | 28 | |

**Visa Fraud Offense:**

| | | |
|---|---|---|
| Base Offense Level | 11 | [USSG § 2L2.1] |
| More than 100 documents | +9 | [USSG § 2L2.1(b)(2)] |
| Abuse of trust | +2 | [USSG § 3B1.3] |
| Adj. Offense Level: | 22 | |

**Education Fraud Offense:**

| | | |
|---|---|---|
| Base offense level | 6 | [USSG § 2B1.1] |

---

[9] The government agrees with defendant that the clear and convincing evidence standard applies to the sentencing enhancements it seeks.  (Obj. 19.)  But because the government's evidence would have proven defendant's relevant and other uncharged conduct beyond a reasonable doubt, the standard is of no practical import here.

| | | |
|---|---|---|
| Loss > $10,0000 | +4 | [USSG § 2B.1(b)(1)(C)] |
| Adj. Offense Level: | 10 | |

**Grouping  (see USSG § 3D1.4)**

| | | |
|---|---|---|
| Group I (tax fraud) | 1 unit | [USSG § 3D1.4(a)] |
| Group II (visa fraud) | ½ unit | [USSG § 3D1.4(b)][10] |
| Group III (education fraud) | 0 units | [USSG § 3D1.4(c)] |
| Total Units: | 1½ units | |

For 1½ units, add 1 level to highest offense level of 28

**Combined offense level:          29**

With a Criminal History Category of I, defendant's recommended Guidelines sentencing range is 87 to 108 months.

### B.    Tax Offense

#### 1.    The Probation Office Properly Determined that Defendant's Tax Loss Is $757,599.72

The Probation Office determined that defendant's federal tax due and owing for tax years 2003 through 2006 is $562,179.02 to the IRS and $195,420.70 to the FTB, for a total USSG § 2T1.1 tax loss of $757,599.72.  (PSR ¶¶ 33-34.) Defendant objects to these figures and advances the incredible claim that, although he pled guilty to a material misstatement of his unreported income, he owes "no taxes." (Obj. at 20) (emphasis in original).

---

[10]  The government does not object to the Probation Office's grouping calculation as applied to its recommended Adjusted Offense Levels for these offenses.  (PSR ¶¶ 58-64.)  If the Court adopts the government's proposed enhancements, however, it results in a greater differential between the Adjusted Offense Levels for the tax and immigration fraud offenses, causing the immigration offense to be assigned only ½ unit (under USSG § 3D1.4(b)), rather than the 1 unit (under USSG § 3D1.4(a)) that the Probation Office calculated.  But, as applied to the Adjusted Offense Levels the Probation Office recommended, its calculation was correct.

Defendants' specific objections are three:  (1) the government's calculations rely on "an unrecognized <u>ad hoc</u> methodology" insofar as it fails to account for "omitted expenses"; (2) the government inappropriately includes as income "disability insurance benefits" received by defendant for his purported ward <u>ad litem</u>, Sandor Bartok; and (3) the government improperly increases net deposits to include cash payments made by defendant and his wife to their housekeeper   (Obj. 20-21.)  Each of these objections is meritless.

a.    <u>The Government's Tax Calculation Complies with the Sentencing Guidelines</u>

First, the Ninth Circuit has specifically held that "§ 2T1.1 does not entitle a defendant to reduce the tax loss charged to him by the amount of potentially legitimate, but unclaimed, deductions even if those deductions are related to the offense." <u>United States v. Yip</u>, 592 F.3d 1035, 1041 (9th Cir. 2010).  Thus, whatever deductions for "omitted expenses" defendant thinks he might be entitled to are of no moment; the Court can simply avoid the whole messy factual dispute by applying USSG § 2T1.1(c)(1)(A) and multiplying unreported gross income by 28%.

The government's calculation of unreported gross income, before the application of exemptions or deductions, relies on the recognized bank deposits method,[11] as defendant admits.  (<u>See</u> Obj. at 21 (noting government's "draft chart . . . does generally follow the required Bank Deposits method")).)  Defendants quibble with this calculation on only two points, disputing (1) the inclusion of the receipts relating to Sandor Bartok and Genesee Royal, the Kleins' residential care facility that was supposedly providing care to Mr. Bartok and (2) the cash paid to the Kleins' housekeeper.  (<u>See</u> Declaration of Carl Knudson (Ex. Z to co-defendant Samuel Klein's sentencing position) and Ex. B thereto.)  These objections are not

---

[11]  The government's methodology is described in detail in the Declaration of Jerome Jenkins at ¶¶ 6, 20, 24.

well founded, as explained below and in the Declaration of Special Agent Jerome Jenkins.  (Jenkins Decl. ¶¶ 22-25; see infra at 13-14.)  But even were these objections sustained, 28% multiplied by defendants' own "net deposits subject to tax" figure of $4,7074,337 (see Ex. bb),  reduced to account for the reported gross income, yields a tax loss in excess of $400,000.  (Id. ¶ 22(b).)   Defendants therefore effectively concede that, if USSG § 2T1.1(c)(1)(A) is applied, tax loss exceeds $400,000.

Defendants ask the government and this Court, however, to wade into the weeds of their possible tax deductions.  But neither this Court nor the government can even get started, given that defendants fail to provide any evidentiary support that would permit evaluation of their proposed deductions.[12]  (See Knudson Decl. ¶ 11 (defendant's expert began his analysis by "summarizing the government's . . . tax calculation for 2003 to 2005" and then comparing it to "additional" — but unspecified — evidence "present in the government's discovery").)  After his history of obstructionist conduct with the IRS, as well as his admission of tax fraud, defendant cannot simply ask the Court to take his word for the fact that the deductions he proffers are supported and allowable.  United States v. Spencer, 178 F.3d 1365, 1368 (10th Cir. 1999) (affirming application of 28% where defendant

_____

[12]  Defendant was required by his plea agreement "to provide all information and documents" regarding the 2003 through 2006 tax years.  He has not tried in good faith to satisfy that obligation.  (Plea Agreement ¶ 3(c); Jenkins Decl. ¶ 23(b).)  The government attempted in advance of sentencing to negotiate the tax loss, including the topic of deductions, for criminal and civil purposes.  As SA Jenkins notes, during such negotiations, when defendants attempted to proffer these same added deductions, the government asked for evidentiary support but was informed only that the deductions were supported in the government's discovery (which consists of at least 20 boxes of bank records and hundreds of pages of summary schedules).  (Jenkins Decl. ¶ 20; Lower Decl. ¶ 12.)  Defendants also have failed to file returns for 2008 and 2009, and have offered an amended 2007 return that claims they are now entitled to a refund. (Jenkins Decl. ¶ 30.)

1  "identified no specific records from which a more accurate tax loss determination

2  could have been made"; noting that "speculation and conclusory allegations will

3  not suffice").

4         In any event, the Guidelines "do not require a Court to speculate about tax

5  deductions that the taxpayer chose not to claim." Yip, 592 F.3d at 1041.  Rather,

6  USSG § 2T1.1(c)(a)(A) provides that "tax loss shall be treated as equal to 28% of

7  the unreported gross income" "unless a more accurate determination of the loss can

8  be made."  Given the fraud permeating the tax returns, defendants' commingling of

9  bank accounts, and defendant Samuel Klein's intentional failure to keep business

10  records, this case is one in which a more accurate determination cannot be made.

11  Indeed, to determine which deductions claimed on defendants' tax returns are

12  legitimate, one would need not only to evaluate the merits of the newly proposed

13  deductions, but also all deductions claimed by the Kleins on their filed returns for

14  the relevant conduct period.  As explained by Special Agent Jenkins, many of the

15  deductions claimed on the Kleins' original tax returns were unsupported or false.

16  (Jenkins Decl. ¶ 12(a), (b), 23(c) (such as deductions for "wages" to defendant

17  Zipora Klein and her husband that do not exist in the bank records ).)[13]  As the

18  Tenth Circuit concluded in Spencer, the Guidelines do not "[give] taxpayers a

19  second opportunity to claim deductions after having been convicted of tax fraud."

20  178 F.3d at 1368.

21

22

23         [13]  The government is skeptical of many of the other claimed deductions

24  such as:  (1) repair expenses, given that the Kleins' claims that they spent large

   sums on the upkeep of their properties has been consistently unsubstantiated and

25  disputed by tenants (Lower Decl., Ex. 47 ¶ 28 (falsely telling a renter that repairs

26  were made while refusing to produce receipts); (2) the flow-through loss claimed

   for "Residential Properties Management" – a partnership that never filed a Form

27  1065 — on the Kleins' 2003 Form 1040 Schedule E; and (3) the Kleins' apparently

28  excessive claim for depreciation.  (Jenkins Decl. ¶13, Ex. 7 at 11).

13

Defendant's position comes down to the incredible assertion that, despite having pled to a fraudulent tax return that understated his income, failing ever to file any employer returns for his home or office staff,[14] and completely omitting the income from his Israeli rental property from his tax returns, defendant happened to stumble into a correct — even overstated — calculation of tax due and owing because, while he might have estimated a bit low as to his income figure,[15] he also forgot to mention all kinds of business expenses that would have wiped it out in any event.  This is utter nonsense.  Moreover, some of the new deductions he seeks are obviously not appropriate — such as claims for deductions of fees associated with the fraudulent religious worker visa petitions to various United States

---

[14]  In addition to the housekeeper, who worked more than full time at defendant's residence, defendant also had at least three different receptionist/office assistants at Smartax over the relevant period, and employed various individuals to assist with property management, such as Dagoberto and Claudia Velez (who provided defendant a letter in support of his sentencing, at Exhibit R).  (See Lower Decl., Ex. 56 ¶ 23, Ex. 71 at 765).  Despite the fact that defendant was a tax preparer who well knew his obligations, none of these individuals ever received a Form W-2 or Form 1099 for their work, and none therefore accumulated Social Security benefits for such work.

[15]  Defendant's claim that the round numbers he reported as "wages" for the Kleins were equal to the amount of Smartax income is beyond belief and inconsistent with all the evidence.  It is difficult to imagine how Smartax could have regularly generated such round amounts of income — $190,000 in 2005, $200,000 in 2006, and $220,000 in 2007.  No such wages — whether in a lump sum or regular payments — are supported in the bank records; rather, defendants treated Smartax as an ATM and simply used it to pay their ongoing living expenses, such as private school tuition and their personal mortgage.  Further, defendant kept no financial books and records to account for Smartax's income and to segregate it from the properties (Jenkins Decl. ¶ 28) — despite completing continuing education courses that taught him that he was required to do so.  Having willfully failed to document his income and expenses, defendant cannot now claim to have acted in good faith in guestimating the net income of the business and reporting it as wages.

immigration agencies (Jenkins Decl. ¶ 23(c)); claims for deductions for Israeli property where some of the income from that property resides in a foreign bank account which is not included in the net bank deposits (id. ¶ 23(d)).

In short, defendant's attempt to gerrymander his deductions so as to affirm the amount of taxable income he asserted on his prior fraudulent return should be rejected. Indeed, the Ninth Circuit's decision in Yip requires that it be so rejected.

        b.    The Monies the Kleins Took from Sandor Bartok in Violation of Law, As Well As the Monies Received for Services Allegedly Rendered to Him, Are Taxable

Defendants also seek to reduce their tax loss by deducting from their gross unreported income the monies they received after Sandor Bartok became a resident of their residential health care facility, Genesee Royal. Defendants apparently believe that, given the passage of time and the fact that no one knows where they kept Mr. Bartok from 2002 through 2006, the government lacks the evidence to demonstrate how they took advantage of Mr. Bartok and defrauded the California Insurance Guarantee Association ("CIGA"). Defendants are wrong.

Defendants also gloss over the distinction between money they took that properly belonged to Mr. Bartok — such as his worker's compensation award and Social Security payment — and money that their residential health care facility, Genesee Royal, received for alleged services rendered to Mr. Bartok. As to the first category, whether or not defendant was a "guardian ad litem" for Mr. Bartok — and nothing other than defendant Klein's bald assertion supports it (Obj. 21) — defendants were not entitled to Mr. Bartok's money and, because they took it in contravention of law, it is taxable. As to the second category, monies received for services provided is the very definition of taxable income.

        i.    *Factual Background re: Sandor Bartok.*

In providing background information to the Probation Office, the Kleins apparently only misleadingly alluded to their income-generating activities

preceding Smartax (see PSR ¶ 98 (stating that from 1995 to 2000 defendants "took care of elderly people," who "lived in an apartment building" owned by defendants).)  In fact, although one would never know from their tax returns, during the period from 1993 to 2002 the Kleins operated at least five residential health care facilities.  (Lower Decl., Ex. 57 at 429-447).[16]  Sandor Bartok became a resident at the Klein facility Genesee Royal on December 26, 1998.  (Id., Ex. 58 at 511).  Mr. Bartok had been severely injured in a workplace accident; he had no children, had never been married, and had a sister in Hungary.  (Id.at 513.)

In January 2000, defendant Samuel Klein obtained a Power of Attorney over Mr. Bartok and, on June 11, 2002, used that power to settle a Mr. Bartok's worker's compensation case with Mr. Bartok's former employer's insurer.  Mr. Bartok's case was successful:  Due to the severity of his injuries, he was awarded $225 in worker's compensation payments per month for the rest of his life, to compensate Mr. Bartok for lost income.  (See Lower Decl. Exs. 54, 55).  In addition to the lost income payments to Mr. Bartok, the worker's compensation insurance company (whose obligations later were assumed by CIGA) also was required to pay Mr. Bartok's medical and living expenses.  These payments were made directly to any doctors or facilities who provided care to Mr. Bartok, to compensate them for services rendered.  (Id.)

As the chart at Exhibit 66 to the Lower Declaration demonstrates, defendants ultimately found a way to get both payments: (1) those intended for Mr. Bartok personally (and taken from him in violation of California law), as well as (2) the payments to Genesee Royal for his home health care services.  All such receipts were taxable to defendants.

---

[16]  Defendants' Forms 1040 from 1996 to 2002 bear no mention of any income from such facilities, although they were licensed and had residents.  (See Lower Decl., Ex. 57).

*ii.*     *The Monies the Kleins Took From Sandor Bartok*
*in Violation of Law Represent Taxable Income.*

After defendant successfully obtained a worker's compensation award for Mr. Bartok, promising Mr. Bartok a lifetime income source, on April 16, 2002, defendants established a joint bank account with Mr. Bartok to receive his worker's compensation payments as well as his Social Security Income. Generally, shortly after payments were made to Mr. Bartok by these government entities, co-defendant Zipora Klein would withdraw the funds with a check to cash. (<u>See</u> Lower Decl. ¶ 19, Ex. 64, 66).  Co-defendant Zipora Klein would then deposit the funds into the Kleins' personal accounts.

These funds intended for Sandor Bartok — but taken by the Kleins — are taxable to them.  In defendant's sentencing position, he claims (without appropriate substantiation in the public records) that, in obtaining the Power of Attorney over Mr. Bartok at the time of the worker's compensation award, he became Mr. Bartok's <u>guardian at litem</u>.  (Obj. 21.)

Critically, however, defendant was precluded under California law governing residential home health care facilities from becoming a conservator or guardian over Mr. Bartok or, for that matter, from even obtaining a power of attorney (as he nevertheless did).  California Code of Regulations, 22 C.C.R. § 87227(d)(2001) (no licensee or employee of a facility shall . . . (1) accept appointment as a guardian or conservator of the person and/or estate of any resident; (2) accept any general or special power of attorney for such person").  Section 87227 (a) provides that, if a resident is incapable of handling his own cash resources — defined in subparagraph (c)(1) to include personal and incidental need allowances from funding sources such as SSI-SSP — such resources shall be safegarded.  The regulation further provides that, upon death of a resident, his cash resources shall "immediately be safeguarded" and appropriate receipts created, and the "executor or adminstrator of the estate shall be notified by the licensee," but if

not exectuor or administrator has been appointed, then the licensee shall provide "immediate written notice of the resident's death . . . to the public administrator of the county."  22 C.C.R. § 87217 (g), (j)(1), (2) and (4).

Further, the California Probate Code prohibits a donative transfer to any person in a "fiduciary relationship with the transferor, including . . . a conservator," as well as a "care custodian of a dependant adult who is the transferor."  Cal. Prob. Code § 21350 (a)(4), (5).[17]  The purpose of the statue was "to prevent unscrupulous persons in fiduciary relationships from obtaining gifts from elderly persons through undue influence or other overbearing behavior."  Bernard v. Foley, 39 Cal.4th 794, 809 (2006) (quoting Bank of America v. Angel View Crippled Children's Foundation , 72 Cal.App.4th 451, 456 (1999)).  The legislature added care custodians to the list of presumptively prohibited transferees in 1997.  Id.

These injunctions exist to protect individuals like Mr. Bartok, whose attorney described him as "basically brain-dead." (Lower Decl., Ex. 54).  As Genesee Royal's licensees, defendants violated their own licensing regulations and the code of common decency in obtaining a joint account with Sandor Bartok and diverting for their own uses the monies intended for him.  Because Mr. Bartok's money came to them in violation of law, it is not a non-taxable gift but taxable income.

> ### iii.    The Monies the Kleins Received for Alleged Services Provided to Bartok By the Defunct Genesee Royale Facility Represent Taxable Income.

Although the residential living facility in which Sandor Bartok resided, Genesee Royal, closed in 2002 (see Lower Decl., Ex. 57), defendants continued to

---

[17]  The statute sets up a rebuttal presumption that a transfer to an listed person, such as a care custodian, was the produce of fraud, duress, menace, or undue influence.  Estate of Shinkle, 97 Cal.App.4th 990, 993 (2002).  The presumption can only be rebutted by clear and convincing evidence not including the transferee's testimony.  (Id.)

bill CIGA for alleged services provided to Mr. Bartok through 2006 (id., Ex. 63-64), and payments continued to come in through 2007.[18]  On October 4, 2006, a bill was submitted for Genesee Royal to CIGA for claimed services to Mr. Bartok including, for the months of October 2005 through January 2006, two additional care givers per day and, from February 2006 through July 2006, three additional care givers per day.  (Id., Ex. 62).  Setting aside the issue of whether services were provided as claimed,[19] the asserted health care services that purport to have been rendered by an independent facility clearly fall in the category of taxable income.  (See Jenkins Decl., Ex. 22(b).)[20]  Put otherwise, whether or not the bills are fraudulent, the fact that they purport to be for services rendered by an independent home health care provider makes them taxable to defendants.

---

[18]  It is unclear where Mr. Bartok resided between Genesee Royale's closure and his passing, given that defendants' residential facilities were closed in 2001 and 2002 and converted to rentals after the commencement of an investigation by the California Department of Social Services (Lower Decl., Ex. 57), and the location that had been Genesee Royale — 803 N. Genesee —  had been converted to a residential duplex around that time (id., Ex.47).

[19] The bills have all the hallmarks of fraud: Genesee Royale (and all the Kleins' residential health care facilities) had long been closed; defendants stated in their depositions that they had no home health care employees and claimed none on their tax returns (Lower Decl., Ex. 69 at 745); and the bills go up considerably, from regular payments of $4000 in 2002 and 2003 (id., Ex. 60) to more than $12,000 per month in bills submitted retroactively after Mr. Bartok's death in 2006 (id., Ex. 62).

[20]  In asserting that the 2007 Form 1099 from CIGA referencing income of $90,000 is nontaxable as "final reimbursement for claims made in respect of Sandor Bartok for his personal and medical care," defendant attempts to conflate the two types of benefits and therefore avoid taking responsibility for the full scope of falsity in his 2007 tax return.  But the facts are that the CIGA 1099 was not to Sandor Bartok, representing his worker's compensation award payments, but to Genesee Royal, for payments made in compromise of its bills for alleged services rendered.

### 2.   The Probation Office Properly Applied USSG § 2T1.1(b)(1)'s Two-Level Enhancement

The Probation Office enhanced defendant's offense level two levels under USSG § 2T1.1(b)(1) because defendant's under-reported income included at least $10,000 in criminally obtained income through Smartax and "defendant failed to report or to correctly identify the source" of that income on his tax returns.  (PSR ¶ 38.)  Defendant's challenge to this enhancement is meritless.  (Obj. 23.)

As explained above, the immigration document preparation side of Smartax was permeated with fraud.  During the relevant time period (2003 through 2007), through Smartax, defendant prepared at least 1,500 visa applications of various types (see Quezada Dec., Exs. C-H) — more than 900 of which used bogus New York addresses — and charged his alien clients, based on the statements of the approximately 25 aliens interviewed by ICE, between $2,000 and $5,000 per application.[21]  Accordingly, defendant easily amassed more than $10,000 in each of the relevant years from criminal activity — namely, defendant's visa fraud — yet defendant under-reported that income.  See 26 C.F.R. § 1.61-14 ("Illegal gains constitute gross income.").

Defendant's suggestion that § 2T1.1(b)(1) applies only to "the sale of drugs . . . from operating an unlawful prostitution business" or other crimes having their own Guidelines section is meritless.  (Obj. 23.)  After all, the enhancement appears in § 2T1.1 — the Guideline that the Sentencing Commission essentially designated eponymously for Tax offenses.

---

[21]  The Probation Office found that defendant "usually" charged his immigration clients $5,000.  (PSR ¶ 23.)  Without any supporting evidence, defendant asserts simply that he "did not."  (Obj. 8.)  This unsupported objection is insufficient to rebut the PSR, but regardless, whether defendant charged $2,000 or $5,000, he clearly prepared enough fraudulent petitions to break through § 2T1.1(b)(1)'s $10,000 floor.

Defendant's additional argument that "[t]he enhancement does not apply where a defendant reports income from an unlawful source, but does not specify that it is from an unlawful source" is a red-herring. (Obj. 23.) Defendant is not being held accountable for failing to identify the source of his criminally derived income. He is being held accountable, as the PSR makes plain, for his under-reporting (i.e., his "failure to report") his criminally derived income.[22] (PSR ¶ 38.)

Under the plain text of the Guideline, a defendant's sentence must be enhanced if he fails to report the criminally derived income or fails to attribute the income to its source. Here, because defendant plainly did the former by under-

_____

[22] Even defendant's red-herring argument is incorrect. The Guideline unambiguously provides that the enhancement applies disjunctively "[i]f the defendant failed to report or to correctly identify the source of income exceeding $10,000 in any year from criminal activity." USSG § 2T1.1(b)(1). Moreover, defendant's reading would read the entire second disjunctive clause out of the Guideline because a tax cheat cannot simultaneously correctly identify the source criminally derived income yet not report the income. In other words, even if a defendant identified a criminal source of income but disclaimed income from the source (e.g., "Wages from Smartax = 0"), there would not be "correct identif[ication]" of the source of criminally derived income because no income was identified.

The cases cited by defendant do not hold otherwise and, in fact, are totally inapposite. United States v. Johnson, 577 F.2d 1304, 1310-11 (5th Cir. 1978) — a case decided nearly a decade before the Guidelines went into effect — merely held that the Firth Amendment allows a defendant the option of disclosing the income without revealing its source but that the Fifth Amendment does not preclude a tax charge if he fails to disclose the income. Similarly, United States v. Roush, 466 F.3d 380, 388 (5th Cir. 2006), merely held, in the context of rejecting a Fifth Amendment challenge to the Guideline, that "[t]he point of the enhancement, as discussed in the Application Notes, is to further deterrence, particularly in light of the chronic under-reporting of criminally-derived income. The two-level increase does not itself force an individual to disclose the income, but merely takes into account the source of income when penalizing non-disclosure." (Citation omitted).

reporting at least $10,000 of criminally derived Smartax income, the enhancement is appropriate.

### 3. The Probation Office Properly Applied USSG § 2T1.1(b)(2)'s Two-Level Enhancement for Use of Sophisticated Means

The Probation Office also enhanced defendant's offense level by two levels under USSG § 2T1.1(b)(2) for use of sophisticated means because he and his wife (a) repeatedly "shifted from failing to file their tax returns to filing complicated tax returns, including various partnerships to declare some of their properties, and claim some amount of income, while significantly and consistently understating it"; (b) issued Smartax "Forms W-2 to themselves . . . filed employer returns from Smartax/Startax, but failed to file tax returns for the corporation. . . . and consistently changed EINs for Smartax/Startax; and (c) "regularly changed the ownership of the ten rental properties that they owned, creating LLCs in the properties' names, . . . effected transfers of the properties to family members (even though the Kleins continued to control the properties and collect the rent generated). . . . [and] failed to claim the properties on their tax returns." (PSR ¶¶ 40-41.)

Defendant does not even address the first basis offered by the Probation Office — the "shift[ing] from failing to file their tax returns to filing complicated tax returns, including various partnerships to declare some of their properties, and claim some amount of income" (PSR ¶ 40) — which is alone fatal to his objection to this enhancement. With respect to the other two bases offered by the Probation Office, defendant properly acknowledges that "'[c]onduct such as hiding assets or transactions or both, through the use of fictitious entities, corporate shells, or offshore financial accounts ordinarily indicates sophisticated means.'" (Obj. 24 (quoting USSG § 2T1.1, cmt. (n.4)).) Nonetheless, defendant argues that his conduct "was neither especially complex nor especially intricate." (Obj. 24.) To refute defendant's argument is simply to restate it:

22

(a)    Although my wife and I owned Smartax and held it as an S-Corporation, our simultaneous issuance of W-2s to ourselves and failure to file corporate tax returns — all to make it look like somebody else owned the S-Corporation and so that the true income derived from it could not be verified — was neither especially complex nor especially intricate;

(b)    Although my wife and I told the IRS that Smartax would no longer be doing business in 2003 and thereafter repeatedly changed Smartax's EIN so the IRS would not know that Smartax was still in business, that conduct was neither especially complex nor especially intricate; and

(c)    Although my wife and I repeatedly changed the ownership of our ten rental properties by moving them in and out of LLCs and the names of various other nominees and simultaneously failed to claim them all on our tax returns, that conduct was neither especially complex nor especially intricate.

To the extent that defendant resists this interpretation of his position with respect Smartax on the basis that the different Smartax EINs referred to "different entities" (Obj. 8), that resistance is meritless.  Throughout defendant and his wife's use of different EINs for Smartax, the business did not change: it was a tax preparation/immigration document preparation business located in defendant's 4929 Wilshire Blvd. office space.  (Lower Decl. ¶ 7.)  Further evidencing that it was the same business and that defendant and his wife were simply trying to game the IRS, defendant and his wife kept the same California Employer Identification Number (246-1432-3) on all of the W-2s that they issued themselves throughout this period.[23]  (Lower Decl. ¶ 7.)

_____

[23]  Between the fourth quarter of 2006 and the first quarter of 2008, defendant also used the aliases "Michael Weiss," "David Weiss," and "Joseph Glenn" to sign Smartax's quarterly employer returns.  (Lower Decl. ¶¶ 2(q)-(v) & Exs. 17-22.)  The government's handwriting expert concluded that the "Michael Weiss" signatures were actually written by defendant.  (Lower Decl. ¶¶ 8(a), (c), (d) & Ex. 11(c).)

23

To the extent that defendant also resists this interpretation of his position on the basis that his failure to file Smartax corporate tax returns "had little or no actual tax consequences" (Obj. 25), his resistance is make-weight and, in any event, wrong.  First, "sophisticated means are identified by their complexity, intricacy, or planning, not their ultimate success."  United States v. Clear, 112 Fed. Appx. 429, 431 (6th Cir. 2004) (citing USSG § 2T1.1(b)(2), cmt. (n.4)) (emphasis added). Moreover, defendant and his wife's constant manipulation of how and the extent to which they reported their Smartax income absolutely resulted in part of their under-statement of income.  The same is true with respect to defendant's assertion that, because his and his wife's rental "properties operate at a tax loss," "[t]he use of numerous business entities" to disguise their true ownership[24] was insufficiently sophisticated (Obj. 25); it was sophisticated, and it did succeed in concealing income from the IRS.[25]

---

[24]  Defendant's suggestion that he only used "business entities" to hide his and his wife's income properties is misleading and false.  One of their properties, a corner property bearing the addresses 7755-57 Waring Avenue and 803 Genessee Avenue, was held by son-in-law (Reuven Lapin) for most of the five-year period between May 2002 and June 2007.  (Jenkins Decl. Ex.A.)  Despite the son-in-law's legal ownership of the property, when he responded to the FTB's inquiry about the interest being paid on it, he effectively acknowledged that he and the Kleins had all committed bank fraud when he stated that he was reported as the owner only "for qualification of loans" and "does not have anything to do with the properties." (Lower Decl. ¶ 23(d) & Ex. 78.)

[25]  The government does not dispute that defendant and his wife's manipulation of how their properties were held assisted them in avoiding civil liability from "litigation and disputes from tenants."  (Obj. 25.)  Critically, however, defendant and his wife did not stop at simply placing their properties in LLCs so as to protect themselves from personal liability.  Instead, they used the LLCs to mislead tenant litigants into believing that they had no ownership stake in the properties whatsoever.  Defendants achieved this goal by hiding their ownership through the use of fictitious individuals and false Secretary of State

(continued...)

All-in-all, defendant and his wife's efforts to conceal Smartax's true business operations and revenue and the "complex web of names, ownership transfers, and legal entities" relating to their income properties facilitated their ability to keep the IRS from ascertaining their true income.  (PSR ¶ 41.)  That plainly satisfies § 2T1.1(b)(2)'s requirements.

### 4.   USSG § 3B1.3's Enhancement for Use of a Special Skill Is Applicable

For the reasons set forth in the government's May 11, 2011, objections to the PSR, USSG § 3B1.3's enhancement for use of a special skill is applicable. Defendant's primary rejoinder that he "has no substantial training, education, or professional licensing" is simply preposterous.  (Obj. 26.)  Although not a CPA, defendant holds himself out as an accountant has a degree in "accounting and business."  (PSR ¶ 95-96.)  Defendant is also a California registered tax preparer

---

[25](...continued)
filings.

For example, in a February 24, 2004 deposition, when asked about who owned 726 North Orange Grove Avenue, which defendant now claims to have owned since 1995 (PSR ¶ 113), defendant testified that neither he nor his wife owned the property and that "726 North Orange Grove LLC" owned the property. (Lower Decl., Ex. 68 at 707-708; see generally 705-709).  Then when asked who owned the LLC, defendant stated under oath that he did not know.  (Id. at 708).  In defendant's Form 1040 for 2004, however, he claimed a loss from a 726 N. Orange Grove Partnership.  (Id., Ex. 13 at 126, 128).  (See also Lower Decl., Ex. 70 at 754, 755 (defendant disclaims ownership of 7755-57 Waring LLC and the decision to transfer the property to a different LLC).

In another deposition, defendant testified under oath that he does not make any real estate transactions and "My wife does whatever my wife does.  I don't run her things."  (Lower Decl., Ex. 68 at 731-32.)  Then, when defendant's wife was asked in a March 22, 2004, deposition about whether she ever owned certain of these properties, she repeatedly testified that she did not remember, even though she and defendant had held every one of them in his wife's name sometime within the preceding 6 to 40 months.  (Compare Lower Decl., Ex. 74 at K078454 & K078492-95 with Jenkins Decl., Ex. A)

and, as he readily admits, is able to be one only because he has taken the certification course and test <u>required</u> by the California Business & Professions Code.  (Obj. 26.)  Moreover, the business underlying a significant portion of this case was called Smartax, and even today, defendant operates a business called "Rightax."  (PSR ¶ 96.)

Under the § 3B1.3 cases cited in the government's May 11, 2011, objections to the PSR, which include cases involving a "professional tax preparer" and a non-CPA accountant using their respective skills to facilitate tax fraud, the enhancement is plainly applicable.  Defendant's criticism of these cases as "out of circuit" is of no moment because, as his failure to cite any case law of his own demonstrates, the Ninth Circuit has neither disagreed with nor called into question these out-of-circuit authorities.  (Obj. 25.)

### 5.   USSG § 3C1.1's Enhancement for Obstruction of Justice Is Applicable

Citing numerous cases and evidence over two pages of discussion in its May 11, 2011, objections to the PSR, the government explained why defendant's submission of his and his wife's fraudulent 2007 tax return during the government's investigation of this case merits USSG § 3C1.1's enhancement for obstruction of justice.  Despite objecting to the enhancement, defendant does not actually confront much of the government's authorities or evidence.  (Obj. 26-29.)  Instead, defendant spends one page summarizing the relevant Guideline; another page attempting to explain how the facts of one of the government's cited authorities (<u>Yip</u>, 592 F.3d at 1037) were more egregious; and then in one paragraph takes the legally untenable position that because the fraudulent statements on his and his wife's 2007 return do not affect his taxable income, the fraudulent statements were immaterial.  (Obj. 26-29.)  The only party who "misses the mark on both the law and the facts" is defendant (Obj. 27), who has done nothing to show why his and his wife's 2007 return does not merit the obstruction

enhancement.  Moreover, lest there be any doubt about the merits of applying the enhancement, defendant's obstructive conduct during these sentencing proceedings in the form of a perjurious declaration submitted in support of his wife's sentencing position independently warrants the enhancement.

As an initial matter, defendant Samuel Klein's pattern of obstruction dates back at least as far as 2005, when Smartax received notices requiring it to file tax returns.  The Kleins filed a bevy of tax returns in response to that notice:  15 returns dating all the way back to 1997.  (Lower Decl. ¶10, Ex. 29.)  But they obfuscated even then, filing federal returns as "single" or "Head of Household," failing to claim Genesee Royal (or other residential care facility) income, filing returns inconsistent with Form 1040s that they previously attached to filed California Forms 540 (id. ¶3(b), (c), Exs. 24-25), and indicating on Smartax's 2003 Form 1120 that it was Smartax's final year and then changing federal EINs regular afterward.  (Id., ¶¶ 4-7, Ex. 27).  These catch-up returns included the 2003 and 2004 returns that were charged in Counts Two and Three of the First Superseding Indictment.  This was obstruction of the highest order, and delayed this investigation by at least three years.

a.    The Kleins' Fraudulent 2007 Tax Return

Defendant's first argument against applying the obstruction enhancement based on his and his wife's submission of their fraudulent 2007 tax return during the pendency of the government's investigation rests on his attempt to distinguish the Ninth Circuit's decision in Yip, 592 F.3d at 1037.  (Obj. 28.)  The government acknowledges that Yip is factually distinguishable.  Indeed, on some level, every fact-bound decision is.  But because "a broad range of conduct can constitute obstruction of justice," United States v. Dota, 33 F.3d 1179, 1190 (9th Cir. 1994), an analysis of the facts here against the Ninth Circuit's acknowledgment that the "obstruction adjustment is appropriate if a defendant obstructs a civil or agency investigation of the same offense that led to the defendant's conviction," Yip, 592

F.3d at 1041, supports application of the adjustment.  Under § 3C1.1, as applied to IRS investigations by Yip, what matters is (1) whether defendant and his wife's fraudulent 2007 return was (a) willfully submitted (b) during the government's investigation — neither of which defendant disputes[26] — and (2) whether the false statements on it were material — contrary to defendant's baseless assertion, they were.

Defendant's assertion that the omissions from his and his wife's 2007 return of income and expenses from their Israeli rental property, of a Schedule H for their housekeeper, of reported interest from bank accounts and of $90,000 that was reported to them from CIGA were not material because they result in "no additional income tax due" employs a frivolous definition of materiality and, moreover, is just wrong.

First, defendant's current position that omissions from a tax return are material only if they affect tax due and owing is inconsistent with the position he has taken previously in this case.  In the parties' joint jury instructions submitted on December 28, 2010, defendant agreed that with respect to materiality "the government is not required to prove that any additional tax was due to the government or that the government was deprived of any tax revenues by reason of any filing of any false return."  (Joint Proposed J.I. 46 (citing 2B Kevin F. O'Malley et al., Federal Jury Practice and Instructions, § 67.19 (6th ed. 2008).)  That is, of course, consistent with the law because the test for materiality is whether, as defendant also agreed previously, a false statement has a "natural tendency to influence, or was capable of influencing, the decisions or activities of

---

[26]  In fact, defendant and his wife's recent presentation of an amended 2007 return (Obj. 28) is prima facie evidence of the falsity of the 2007 return that they initially submitted.  Even their amended return, which like the initial 2007 return was signed by defendant's co-counsel Mark Hathaway as the preparer, does not comply with the Internal Revenue Code in at least one material respect.

the Internal Revenue Service." (Joint Proposed J.I. 41 (citing Ninth Circuit Model Jury Instruction No. 9.39 (2010 ed.).); see also United States v. Marashi, 913 F.2d 724, 736 (9th Cir. 1990) (rejecting as "irrelevant" sufficiency of evidence challenge based on asserted lack of tax deficiency in § 7206(1) case). Plainly, the omission of items capable of yielding income or expenses is material because their absence hinders the IRS ability to even know to investigate them. Indeed, that is precisely why these jury instructions exist. Defendant, despite agreeing to them previously, has simply chosen to ignore them now that it is convenient to do so.

Second, even if the government was required to show that these omissions affected the bottom line, it has done so. For example, the government's expert took his unreported total income calculation, prepared conservatively for the purposes of trial and to meet the government's beyond-a-reasonable doubt burden, and used it to prepare a calculation of tax due and owing for purposes of settlement. (Knudson Decl., Ex. AA). This report — provided to the defendants a January 27, 2011 meeting — demonstrates that, even allowing defendants the benefit of deductions they took on their filed tax returns plus some additional depreciation deductions, tax due and owing exceeds $400,000. (Jenkins Decl. ¶¶ 15, 16, 24).

### b.   Defendant's Perjurious Declaration to This Court

In support of the sentencing position of his wife, defendant submitted a declaration under penalty of perjury asserting that his wife "had no role in the preparation of [their] tax returns" because she "did not have the knowledge or experience necessary to evaluate [their] tax liability" and no "management authority or control" over Smartax or their "various investment properties." (S. Klein Decl.) Defendant's wife repeatedly cites the declaration and her entire sentencing position is premised on the declaration's theme. While romantics may laud defendant for taking the bullet for his wife, the declaration is nothing more than another false document submitted by the Kleins to an arm of government.

29

The voluminous evidence of co-defendant Zipora Klein's participation in various aspects of managing Smartax and the Kleins' investment properties, including the Kleins' own prior statements — some under penalty of perjury — thoroughly refute defendant's current assertions.  Regarding Smartax, in April 2005, defendant's wife asserted under penalty of perjury in April 2005 tax filings that she had been a 50% shareholder and officer in the business in 2002 and 2003 (Lower Decl. Ex. 10 at 1 (claiming to be an "officer" of Smartax), 9 (claiming to be 50% shareholder); Ex. 12 at 1, 7 (same)).  Defendant's wife similarly claimed on an April 8, 2003, application to lease a luxury Acura that she was Smartax's "V.P." and earned $20,000 per month as such.  (Lower Decl., Ex. 79.)

Regarding the Kleins' investment properties, defendant's wife purchased most of them, repeatedly obtained financing and/or refinancing for the properties, and was active in managing them.  (See Jenkins Decl., Ex. A.)  Tenants of the properties stated that defendant's wife was the "front person of the operation." (Lower Decl., Ex. 56).   Others likewise noted that she collected rent (Lower Decl., Exs. 45-48, 56), negotiated repairs and changes in rent (id., Exs. 44, 46), and, on one occasion, "screamed" at an Escrow company that was about to release escrowed funds to tenants (id., Ex. 47).  Additionally, defendant's wife listed five of the properties on her own, individual, "self-prepared" Head of Household 2005 tax return filed with the IRS under penalty of perjury.  (while defendant Samuel Klein filed as "single" for that same tax year).  (See Lower Decl., Exs. 6, 7.)  Most damning, however, in a February 2004 deposition, defendant disavowed under oath any control over the Kleins' investment properties and instead attributed full responsibility for such transactions to his wife, stating that he does not make any real estate transactions and "My wife does whatever my wife does.  I don't run her things."  (Lower Decl., Ex. 68 at 731-32.)

Defendant and his wife cannot have it both ways, see 18 U.S.C. § 1623(c) (two facially inconsistent under oath statements sufficient to establish perjury

without establishing which is true), and their attempt to do so in connection with their sentencings further merits the obstruction enhancement.

### C.   Immigration Offense

#### 1.   The Probation Office Properly Applied USSG § 2L2.1(b)(2)(C)'s Nine-Level Enhancement for Preparation of Over 100 Fraudulent Documents

The Probation Office enhanced defendant's offense level for his visa fraud offense by nine levels under USSG § 2L2.1(b)(2)(C) because defendant filed over 100 false immigration documents.  (PSR ¶ 47.)  Defendant objects, asserting that the Probation Office "includes no information or evidence to support is allegation that [1,549] documents were fraudulent" and that "fewer than 100 documents were fraudulent." (Obj. 29.)  Defendant's objection is baseless.

Defendant's immigration business was utterly permeated with fraud.  The Court will no doubt recall IRS Special Agent Christopher Olson's testimony, in which he showed the jury the numerous examples of literally cut-and-pasted (or cut-and-taped) letters that defendant fabricated to support the fraudulent visa applications that he was submitting.  (See Quezada Decl. ¶¶ 10(c)-(d) & Exs. O-P.)

Defendant's fraudulent immigration filings were not limited to petitions for religious worker visas.  More than 900 immigration filings prepared by defendant were fraudulent simply because they did not list the actual addresses of defendant's clients, but instead used New York addresses associated with the Klein's children. (Quezada Decl. ¶ 2 & Exs. C-G; see also PSR ¶¶ 24-25.)  Defendant admitted to law enforcement that he used the New York addresses precisely for the purpose of trying to fool "Immigration" into looking for his clients "in New York instead of Los Angeles."  (Quezada Decl. ¶ 3, J).  For this reason alone, defendant's primary objection to application of the enhancement — his unsubstantiated assertion that "many" of the documents fraudulently sent to his New York-based children were I-539 petitions for tourist visa extensions sent there "as a courtesy" for his immigrant clients to pick up in New York —  is easily rejected.

But defendant's claim is belied not only by his own express admission but also by other facts of record.  First, as evidenced through the trial testimony of SA Olson, many fraudulent immigration documents addressed to the New York addresses were recovered in defendant's Los Angeles-based office, indicating that they were not sent to New York for clients to pick up but rather were sent from New York to Los Angeles where clients picked them up at Smartax.  Second, the evidence suggests that the New York address was used as a matter of course without consulting aliens in advance.  As N. Paz testified at trial, she had no interest in going to New York and did not have any connection there.  The pattern is consistent with the facts captured on the recording made by the confidential informant, who was not informed until after the fact that his visa extensions had been done "through New York."  (Id., Ex. Q at K079979.)[27]

Moreover, even subtracting the I-539 tourist visas that defendant claims that he sent to his children's addresses "as a courtesy" (Obj. 29-30 & n.5), there were still well over 100 visa petitions to listing a fraudulent address..  Indeed, even just including Forms I-129 (used for the false religious worker visas), the number of fraudulent petitions would exceed 100.  (Quezada Decl., Ex. I.)  If one adds just Form I-360 petitions (used for false SR-1 visa petitions like the one defendant admitted in the factual basis of his plea) (PSR ¶ 24), and Forms I-140 (used for the

---

[27]  Finally, to the extent that defendant contends that the use of a false address on an immigration document is "not material," no case has ever imported § 1546(a)'s materiality requirement for a false immigration document offense into § 2L2.1(b)(2)'s enhancement, and even if such a materiality requirement was imported into § 2L2.1(b)(2), the misrepresentation of an alien's address on an immigration document is material because it is capable of or has a tendency to hinder the immigration authorities' ability to locate and investigate the petitioning alien (Quezada Decl. ¶ 8) — even if they are here on merely an extended "tourist visa" (Obj. 30).

confidential informant, see also Quezada Decl., Ex. S), the number is close to 200.[28]

Contrary to defendant's claim (Obj. 30), the agent's calculations do not improperly double-count because they include, in some cases, more than one petition for relief for a particular person. SA Quezada's charts summarize petitions filed: each petition is a separate "document" within the meaning of USSG § 2L2.1(b)(2)(C), because they seek different types of relief. For example, as evidenced with regard to N. Paz, one may petition USCIS for a non-immigrant R-1 visa, which permits one to stay in the country for a limited period to work as a religious worker, later request (via a separate petition) an SR-1 visa to immigrate as a religious worker, and then later attempt to adjust status to become a Legal Permanent Resident via a Form I-485. Each of these forms of relief requires a separate petition, and the type of relief received has different employment (and life consequences). It cannot be the case that fraud in connection with separate visa petitions for separate forms of relief at separate times are subsumed as a single "document." See United States v. Badmus, 325 F.3d 133 (2nd Cir. 2003) (multiple lottery visa submissions each counted as a separate document because set refers to documents used "together, by one person, for a single purpose").

## 2. USSG § 3B1.3's Abuse of Trust Enhancement Is Applicable

Citing numerous cases and evidence over two full pages of discussion in its May 11, 2011, objections to the PSR, the government explained why defendant's immigration fraud abused the trust of his immigrant clients and therefore merits USSG § 3B1.3's abuse of trust enhancement. Again, despite objecting to the

---

[28] Such number would also not include false petitions for an abused spouse, or marriage petitions, and the evidence demonstrates that defendant also prepared false applications of these types. (Quezada Decl. ¶¶10-14 , Ex. V (Shahamorof), Ex. T (marriage petition), Ex. R (marriage fraud referral); see also Ex. Z at K079982  (defendant suggesting to the confidential informant that he "get married" trying to refer him).

enhancement, defendant does not actually confront the government's argument or authorities. (Obj. 30-31.) Instead, defendant again spends considerable time summarizing and quoting the Guideline and then, in summarizing the government's argument, omits and fails to address its centerpiece.

As the government explained, "Defendant <u>assured his clients</u> that he could get then legal status for them to remain in the United States, and, in accepting their money for his purported services, assumed the position of an agent." (Gov't Obj. PSR 6 (emphasis added).) Unable to refute this reality or establish that he somehow did not abuse the "private trust" placed in him by his clients, USSG § 3B1.3, cmt. (n.1), defendant simply asserts that "many individuals fill out and file their own immigration related petitions" and that he "was an ordinary businessman who advertised his services, met with clients and filed forms on their behalf" (Opp. 31). Because defendant has done nothing to show that in (a) promising his clients that he would obtain lawful immigrant status for them, (b) taking their money, and then (c) electing what kind of immigration petition to file based on the knowledge of immigration laws that his clients lacked but that he professed to have, he abused his client's trust when his services turned out to be a fraud.

## D.   Education Fraud Offense

The Probation Office enhanced defendant's offense level for his education benefit fraud offense four levels under USSG § 2B1.1(b)(1)(C) because the loss from defendant's offense and similar related conduct was more than $10,000. (PSR ¶ 53.) Defendant objects to this enhancement on the patently frivolous bases that "the loan was never funded or disbursed" and that he "fully intended to repay the loan." (Obj. 31.)

Defendant's attempt to deny any intent to defraud the Department of Education rests on a factual fallacy and is simply another example of defendants' general theme throughout their sentencing papers that they meant no harm. First,

the Pell Grant that defendant applied for in the FAFSA application underlying his guilty plea was not a "loan" but, as its name indicates, a grant that, if granted, does not require repayment.  (Hodge Decl. ¶ 5, Exs. AA, BB); see also, e.g., California Cosmetology Coalition v. Riley, 110 F.3d 1454, 1455 (9th Cir. 1997).  Second, as the PSR made plain, the DOE did rely on false FAFSAs filed by defendant on three prior occasions to grant aid (PSR ¶ 27) — not loans.[29]

Legally, defendant's position is equally wrong.  The fact that the false 2006 FAFSA underlying defendant's guilty plea did not result in a funded benefit is of no moment because, as the Guideline's application notes make clear, intended loss "includes intended pecuniary harm that would have been impossible or unlikely to occur."  USSG § 2B1.1(b)(1), cmt. (n.3(A)(ii)); see also United States v. Tulaner, 512 F.3d 576, 578 (9th Cir. 2008) (applying straightforward application note text to include losses that the defendant was incapable of effecting).  Nor is any intent to repay relevant to determining loss.  Under the current fraud Guidelines, the inquiry into "intended loss should not be an inquiry into intent to repay, as suggested by case law interpreting the prior sentencing guideline, but rather should focus on the intended financial harm."  United States v. McCormac, 309 F.3d 623, 629 (9th Cir. 2002).  Regardless, the evidence thoroughly refutes defendant's unsupported assertion that he intended to repay the DOE for the grants he intended

---

[29]  In prior years, defendant had filed three similarly false FAFSA applications for the 2001-2002 and 2002-2003 school years, each claiming income of only around $30,000, in contrast to the higher income figures on defendants' tax returns (which of course as demonstrated herein also were false).  In 2002, defendant went so far as to prepare a false Form 1040 tax return to send his son's school to match the claimed income amount.  (Cf. Hodge Decl. Ex. X (false Klein 2001 Form 1040 with Yeshiva financial aid file); Lower Decl. Ex. 8 (defendants' filed 2001 Form 1040).  Based on these false FAFSAs, the DOE awarded defendants' sons three Pell Grants of more than $8,000.  In preparing the false 2006 FAFSA, defendant sought the same aid and knew that if he lied as in prior years, his son would qualify and thereby reduce his tuition bill.

1 to steal for them; defendant is a serial fraudster who will say anything to line his

2 pockets with government money.

3 **E.    Defendant Is Not Entitled to a Reduction for Acceptance of Responsibility**

4 The Probation Office declined to recommend that defendant receive USSG §

5 3E1.1's two-level reduction for acceptance of responsibility because he did not

6 plead guilty "until three days into trial," "has provided no further evidence of

7 acceptance of responsibility," and has still not resolved his outstanding tax

8 liabilities.  (PSR ¶ 65.)  Although each of these considerations is appropriate,

9 defendant is seemingly of the view that because he pleaded guilty (to some, but not

10 even to one of each of his charges), § 3E1.1's reduction is his as a matter of right.

11 Indeed, all defendant offers in support of his claim that he deserves § 3E1.1's

12 reduction is that he "admitted to all of the elements of each offense he pleaded

13 guilty to." (Obj. 33.)  Doing so, however, does not entitle a defendant to the

14 reduction.  See USSG § 3E1.1, cmt. (n.3) ("A defendant who enters a guilty plea is

15 not entitled to an adjustment [for acceptance of responsibility] as a matter of

16 right.").

17 The timing of a defendant's guilty plea may militate against such a

18 reduction.  See USSG § 3E1.1, cmt. (n.1(H)) ("timeliness of the defendant's

19 conduct in manifesting the acceptance of responsibility" is an "appropriate

20 consideration[]").  Here, defendant and his wife waited until three days into trial

21 (after months of government preparation for what was to be a three-week trial) to

22 plead guilty.  Since then, defendant has not only failed to "provide[] . . . further

23 evidence of acceptance of responsibility" (PSR ¶ 65) but has actually acted

24 inconsistently with acceptance of responsibility.

25 First, defendant's objections to each sentencing enhancement recommended

26 by the Probation Office and the government, including some based on patently

27 false denials of relevant conduct warrants no reduction for acceptance of

28 responsibility.  See USSG § 3E1.1, cmt. (n.1(a)) ("a defendant who falsely denies,

36

or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility"); United States v. Scrivener, 189 F.3d 944, 947-49 (9th Cir. 1999) (defendant pled guilty but later tried to minimize his involvement in a manner that the district court found "incredible"); United States v. Rutledge, 28 F.3d 998, 1002 (9th Cir. 1994) ("a defendant has the right to remain silent regarding relevant, uncharged conduct; but, once he relinquishes that right and falsely denies such conduct, the district court may weigh the false denial in considering a reduction for acceptance of responsibility."); United States v. Martinez-Gonzalez, 962 F.2d 874, 878 (9th Cir. 1992) (defendant told the Probation Officer what the district court found to be a "truly incredible" version of the facts); United States v. Ramos, 923 F.2d 1346, 1360 (9th Cir. 1991) (defendant offered a "minimalist description of his involvement in the affair"), overruled on other grounds by United States v. Ruiz, 257 F.3d 1030, 1032 (9th Cir. 2001) (en banc).

Defendant's obstructionist conduct continues:  In contravention of their plea agreements, defendants have failed to file returns for 2008 and 2009, and have offered an amended 2007 return that, while admitting a failure to claim their property in Israel or their full time housekeeper, like their proffered tax calculations here, also asserts that in fact they are now entitled to a refund. (Jenkins Decl. ¶ 30.)  Moreover, lest there be any doubt that defendant is undeserving of a reduction for acceptance of responsibility, his attempt to defraud this Court by submitting a patently false sworn declaration in support of his wife's sentencing position should be the end of the matter.

## III. SECTION 3553(A) FACTOR ANALYSIS

The complexity and duration of the Kleins' scheme to defraud the IRS, coupled with defendant's essential role in it, his obstinate resistance to accept full responsibility for it, and his attempt to defraud this Court requires a significant term of imprisonment.

The nature and circumstances of defendant's offense, the concern for just punishment, and the needs to promote respect for the law and adequate deterrence to crimes of this nature support a sentence of 87 months.  See 18 U.S.C. § 3553(a)(1), (a)(2)(A), (a)(2)(B).  Defendant is a serial fraudster who has lied, defrauded, or attempted to defraud at least three federal agencies, two agencies of the State of California, and this Court.  It is obvious from defendant's willingness to attempt to further defraud the IRS after learning of its criminal investigation in this case and from defendant's willingness to attempt to defraud this Court during these sentencing proceedings that defendant does not respect the law and that his newly found status as a convicted felon are insufficient to deter him.  Perhaps this is why defendant spends a full page of his sentencing position arguing generically that because he is old, he is unlikely to reoffend.  (Obj. 16-17.)  In any event, defendant's conduct throughout the investigation and up through the sentencing in this case demonstrate otherwise.

Defendant's assertion that "unique circumstances" "preceded and precipitated" his and his wife's offenses and that he is therefore "unlikely" to recidivate is equally generic and therefore unhelpful.  (Obj. 17.)  There was nothing "unique" about what "preceded and precipitated" defendant's frauds; the only thing that motivated them was plain-and-simple, green-and-white, greed. Further, defendant's offenses are easily repeated.  The government is simply ill-equipped to detect all fraudulent immigration document preparers who charge their clients cash, use difficult-to-trace addresses, and are willing to fabricate the petitioning alien's credentials.  The government is similarly ill-equipped to detect all tax evaders whose income comes largely from cash, whose real property tax shelters are held in the names of fictitious entities and nominees, and who have overseas banking privileges.  Cf. United States v. Bragg, 582 F.3d 965, 969 (9th Cir. 2010) ("'Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the

tax laws is a primary consideration underlying these guidelines.'" (quoting U.S. Sentencing Guidelines Manual ch. 2, pt. T, introductory cmt.)).  It is not at all difficult to conceive that defendant, who now owns and operates "Rightax" (PSR ¶ 96), which is effectively Smartax's sequel, might simply repeat what he did in this case (only with added sophistication based on what he learned from the government's investigation and prosecution).

Regardless, because such economic and fraud-based crimes like defendant's are "more rational, cool, and calculated than sudden crimes of passion or opportunity," Stephanos Bibas, <u>White Collar Plea Bargaining and Sentencing After Booker</u>, 47 Wm. & Mary L. Rev. 721, 724 (2005), the probationary sentence requested by defendant would send the message that the punishment for stealing over three-quarters of a million dollars from the government is worth no prison time, a calculus that any number of aspiring fraudsters would find quite acceptable.

The personal circumstances and characteristics that defendant champions in his sentencing position (Obj. 13-14) do not mitigate the need for a substantial term of imprisonment.  <u>See</u> 18 U.S.C. § 3553(a)(1).  As the Court knows well, many defendants proffer evidence of the reliance of others on them for support and their commitment to their community.  But even those defendants who proffer family circumstances like defendant's – that they support elderly relatives or young children – are often found undeserving of sentence reductions.  <u>Cf., e.g.</u>, <u>United States v. Miller</u>, 991 F.2d 552, 553 (9th Cir. 1993) (fact that the defendant's two small children "would be placed at potential risk" upon the defendant's incarceration did not support Guidelines departure); <u>United States v. Berlier</u>, 948 F.2d 1093, 1096 (9th Cir. 1991) (defendant's "efforts to keep his family together" did not support Guidelines departure).  This is particularly true where the defendant is not an irreplaceable caretaker, and contrary to defendant's assertions,

he is not.[30]  (Obj. 11-13).  Defendant and his wife have five adult, college-educated children who can care for their grandmother (PSR ¶ 84), plus over $3.5 million to pay for supplementing professional elder care (PSR ¶ 102), when defendant and his wife go to prison.

Moreover, far from mitigating defendant's culpability for his criminal conduct, his background and family history actually present facts in aggravation. Unlike defendants whose disrespect for the law arguably can be traced to an upbringing of abuse and neglect, see, e.g., United States v. Vonner, 516 F.3d 382, 388-90 (6th Cir. 2008) (en banc) (affirming within-Guidelines sentence despite uncontroverted evidence that the defendant "suffered abuse, abandonment, violence, neglect, and trauma as a young child"), defendant committed his brazen offense and its related conduct despite being an educated man (PSR ¶ 95) who came from an apparently devout and intact family (PSR ¶ 80).  The views of defendant's family and community members that he is generous and kind likewise fail to present mitigating circumstances.  It is easy to be generous with one's time and money when flush with funds obtained through years of defrauding the government.  Moreover, it is one thing to be generous toward one's own family and the community of which one is a part (almost all of the letters supporting defendant's character are from members or organizations within the devout and close-knit Jewish community); it is quite another to be generous toward all, including other taxpayers who rely on everybody to pay their share.

Reinforcing that defendant is not a selfless person deserving of mitigation at sentencing is the way in which he has picked-and-chosen when to be truthful and

---

[30]  While defendant and his wife now assert that they are essential care-givers for Zipora Klein's mother, Cila Guttman, they took a very different position in 2003 with the Social Security Administration.  In a July 31, 2003, claim to that agency, co-defendant Zipora Klien stated that she "rent[s] a room to Cila Guttman," and does "not consider [her] to be a member . . . of the household." (Lower Decl. Ex. 37.)

forthcoming, including throughout this case.  Just as defendant will tell the IRS, financial institutions, and this Court what he thinks he needs to tell them to benefit him at any given time, defendant has been selective with him generosity and charity, electing for whatever reason to put himself and the community that matters to him above the greater community of American citizens.  The Court should not reward defendant by giving him a lenient sentence for what is, at the end of the day, his in fact selfish decisions to put the individuals and community about which he cares above everybody else.

## IV.    <u>CONCLUSION</u>

For the reasons set forth above, defendant should be sentenced to 87 months in custody, and ordered to pay restitution in the amount of $757,599.72, as specified by the Probation Office and a criminal fine of $125,000 (<u>see</u> USSG § 5E1.2; PSR ¶ 114).