Mark J. Werksman, Esq. (Cal. Bar No. 120767)
Mark M. Hathaway, Esq. (Cal. Bar No. 151332)
Melissa A. Weinberger, Esq. (Cal. Bar No. 238432)
**LAW OFFICES OF MARK J. WERKSMAN**
**888 West Sixth Street, Fourth Floor**
**Los Angeles, California 90017**
**Telephone: (213) 688-0460**
**Facsimile: (213) 624-1942**

Attorneys for Defendant
SAMUEL KLEIN

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br>Plaintiff,<br>v.<br>SAMUEL KLEIN<br>Defendant. | CASE NO. 10-CR-00015-RGK<br>**DEFENDANT SAMUEL KLEIN'S REPLY TO THE GOVERNMENT'S OPPOSITION; MEMORANDUM OF POINTS AND AUTHORITIES; EXHIBITS; DECLARATION** |

TO THE HONORABLE R. GARY KLAUSNER, UNITED STATES DISTRICT COURT JUDGE AND TO ASSISTANT UNITED STATES ATTORNEYS KERI CURTIS AXEL AND JEAN-CLAUDE ANDRE:

Defendant, Samuel Klein, by and through his counsel of record, the Law Offices of Mark J. Werksman, hereby files his Reply to the Government's Sentencing Memorandum Regarding, and Opposition to Sentencing Position of Defendant Samuel Klein.

Mr. Klein's Reply is based upon the factual basis to his plea, Defendant Samuel Klein's Objections to the Presentence Investigation Report and Sentencing Position, the attached Memorandum of Points and Authorities, the declarations of Carl Knudson, Mark M Hathaway, and Melissa Weinberger filed herein, all exhibits filed hereto, and upon any oral argument and other evidence that shall be presented

at the sentencing hearing pursuant to Federal Rules of Criminal Procedure, Rule 32(c)(1).

LAW OFFICES OF MARK J. WERKSMAN

Dated: July 25, 2011

By: ______________________

Mark J. Werksman
Mark M. Hathaway
Melissa A. Weinberger
Attorneys for Defendant
Samuel Klein

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . v

I. INTRODUCTION. . . . . . . . . . 1

II. ARGUMENT . . . . . . . . . . 1

III. THE SENTENCING GUIDELINES. . . . . . . . . . 4

A. THE TAX OFFENSE . . . . . . . . . . 4

1. Agreement on Gross Income. . . . . . . . . . 4

2. Bank Deposits Method Not Followed By Government or PSR. . . . . . . . . . 5

3. The Government's Tax Calculation Does Not Comply with the Sentencing Guidelines. . . . . . . . . . 6

4. Uncle Sandor Bartok. . . . . . . . . . 9

5. Bank Deposits Method of Proving Income. . . . . . . . . . 10

6. Defendant's Bank Deposits Method calculation. . . . . . . . . . 11

7. Other Related Conduct. . . . . . . . . . 12

8. Mr. Klein Did Not Fail to Report the Source of Illegal Income. . . . . . . . . . 13

9. Mr. Klein Did Not Use Sophisticated Means to Commit the Tax Offense . . . . . . . . . . 14

10. Mr. Klein Did Not Use Special Skill in the Preparation of His Taxes. . . . . . . . . . 16

11. Mr. Klein Did Not Obstruct Justice During The Tax Investigation . . . . . . . . . . 16

B. THE VISA FRAUD OFFENSE . . . . . . . . . . 18

1. Mr. Klein Did Not Submit More than 100 Fraudulent Visas . . . . . . . . . . 18

2. Mr. Klein Did Not Abuse His Clients' Trust . . . . . . . . . . 21

C. THE FALSE STATEMENT TO THE DEPARTMENT OF EDUCATION OFFENSE . . . . . . . . . . 21

D. MR. KLEIN IS CONTRITE AND HAS TAKEN RESPONSIBILITY . . . . . . . . . . 22

III. CONCLUSION . . . . . . . . . . 22

# TABLE OF AUTHORITIES

## FEDERAL CASES

*United States v. Badmus*, 325 F.3d 133 (2d Cir. 2003) . . . . . . . . . . . . . . . 20, 21

*United States v. Charlesworth*, 217 F.3d 1155 (9th Cir. 2000) . . . . . . . . . . . . . . 3

*United States v. Dota*, 33 F.3d 1179 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Franklin*, 235 F.3d 1165 (9th Cir. 2000) . . . . . . . . . . . . . . . . . 2

*United States v. Kojayan*, 8 F.3d 1315 (9th Cir. 1993). . . . . . . . . . . . . . . . . . . . 1

*United States v. Langer*, 618 F.3d 1044 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . 2

*United States v. Luca*, 183 F.3d 1018 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . 17

*United States v. Marin-Cuevas*, 147 F.3d 889 (9th Cir. 1998) . . . . . . . . . . . . . 2

*United States v. Matsumaru*, 244 F.3d 1092 (9th Cir. 2001) . . . . . . . . . . . . . . 19

*United States v. Romero-Rendon*, 220 F.3d 1159 (9th Cir. 2000) . . . . . . . . . . . 2

*United States v. Solano-Godines*, 120 F.3d 957 (9th Cir. 1997) . . . . . . . . . . . . 17

*United States v. Spencer*, 178 F.3d 1365 (10th Cir. 1999) . . . . . . . . . . . . . . . . 8

*United States v. Stein*, 437 F.2d 775 (7th Cir. 1971.) . . . . . . . . . . . . . . . . . . . 11

*United States v. Williams*, 217 F.3d 751 (9th Cir. 2000) . . . . . . . . . . . . . . . . . 13

*United States v. Yip*, 592 F.3d 1035 (9th Cir. Haw. 2010) . . . . . . . . . . . . . . 9, 18

## FEDERAL STATUTES AND REGULATIONS

26 C.F.R. § 1.164-1(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

26 U.S.C. § 63. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 8

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## INTRODUCTION.

The government's Opposition is inflammatory and over-the-top -- far from presenting the facts fairly,[1] the government engages in name calling and obfuscation. Instead of addressing and nit-picking every skewed "fact" the government presents, Mr. Klein will focus here on the substantive issues. Mr. Klein pleaded guilty to three offenses: tax fraud, immigration fraud and submitting a false statement on a loan document to the Department of Education. He fully acknowledges committing each offense and takes complete responsibility for his wrongful actions. He does not, however, take responsibility for crimes he did not commit, conduct he did not engage in, or actions that are not his own. The plea agreement specifically contemplates that the parties are free to seek any sentence and to argue for or against any criminal history category, base offense level, specific offense characteristics, adjustments, departures and variances. (Plea at ¶ 17.) Distilled down to the simple facts, this is a case that warrants probation.

## II.

## ARGUMENT

The government agrees that a clear and convincing standard applies to the many sentence enhancements it seeks. (Opp. at 9, fn. 9.)[2] However, perplexingly, the government seeks an end run around its burden, claiming, in one part of its

---

[1]"While lawyers representing private parties may–indeed, must–do everything ethically permissible to advance their clients' interests, lawyers representing the government in criminal cases serve truth and justice first. The prosecutor's job isn't just to win, but to win fairly. . ." *United States v. Kojayan*, 8 F.3d 1315, 1323 (9th Cir. 1993).

[2]Hereinafter, Mr. Klein will refer to the Government's Opposition as "Opp.," to the previously filed Government's Objections to the PSR as "Govt. Obj.," and to Mr. Klein's Sentencing Position as "Sent. Position."

Opposition, that the PSR satisfies the government's burden (Opp. at 2 and fn. 2), and, in another section of its Opposition, arguing that it "would have proven" relevant conduct at trial. (Opp. at 9, fn. 9.) Neither of these assertions are supported by the law.

The government cites to several cases for the proposition that the PSR satisfies the government's burden of proving facts at sentencing, but the holding in each case is mis-characterized. In *United States v. Romero-Rendon*, 220 F. 3d 1159 (9th Cir. 2000), the Ninth Circuit held that the criminal history in a PSR was clear and convincing evidence of the defendant's prior conviction, because it was computer generated *and* the defendant did not object to it at sentencing. *Accord, United States v. Franklin*, 235 F.3d 1165 (9th Cir. 2000)(". . .in *Romero-Rendon* we held that when a PSR specifies the statute of conviction and the defendant does not contest the accuracy of the PSR, the district court does not err by relying on the PSR to enhance a sentence for criminal history. . .because the PSR alone provides clear and convincing evidence of the previous conviction"). Similarly unavailing is *United States v. Langer*, 618 F.3d 1044, 1048 (9th Cir. 2010). In *Langer*, the defendant did not challenge the fact of his prior conviction but only argued that the rap sheet alone did not satisfy the government's burden of proving his prior conviction by a preponderance of the evidence. Importantly, the defendant did not argue that he was not convicted of the crime, and the court in *Langer* did not consider the propriety of PSR, the court considered only the rap sheet. Finally, the government cites to *United States v. Marin-Cuevas*, 147 F.3d 889, 895 (9th Cir. 1998), which also considered whether a PSR was sufficient to prove a prior conviction where the defendant did not dispute the fact of the conviction but only the method of proving it. In sum, these three cases- *Romero-Rendon*, *Langer* and *Martin-Cuevas* - consider the narrow issue of proving prior convictions with rap sheets and/or information in the PSR, and are inapplicable outside the context of proving prior convictions.

The government also cites to *United States v. Charlesworth*, 217 F.3d 1155, 1160-61 (9th Cir. 2000), for the proposition that, "absent evidentiary contradiction" the PSR can carry the government's burden. (Opp. at 2, fn 2.) In *Charlesworth*, the court held that because the defendant never challenged the accuracy of the PSR and because he did not offer evidence to contradict the PSR, the PSR was sufficient to prove facts by a preponderance of the evidence. While *Charlesworth* considers using the PSR to prove facts outside of the prior conviction context, in that case the defendant *did not challenge the PSR* and the sentencing court only considered a preponderance of the evidence standard. Here, Mr. Klein has explicitly challenged the PSR and has offered his own evidence, or in other instances, a more accurate interpretation of the evidence.

Without citation to any authority, the government also claims that, "because the government's evidence would have proven defendant's relevant and other uncharged conduct beyond a reasonable doubt, the [clear and convincing evidence] standard is of no practical import here." (Opp. at 9, fn. 9.) There is no legal support for the proposition that the government, unilaterally claiming it could prove relevant and other uncharged conduct beyond a reasonable doubt if the case went to trial, satisfies its burden of proving sentencing enhancements by clear and convincing evidence. The government should be held to its burden of proving each proposed enhancement by clear and convincing evidence.

/ / /

/ / /

/ / /

## III.

## THE SENTENCING GUIDELINES.

### A. THE TAX OFFENSE

#### 1. Agreement on Gross Income.

The government, PSR, and defense generally agree on the computation of Gross Income under the Bank Deposits Method for each tax year as follows:

| Description | 2003 | 2004 |
|---|---|---|
| Total Deposits | $2,083,337.23 | $1,761,656.70 |
| - Non-Income Deposits and Items | ($1,219,504.25) | ($867,068.76) |
| = Gross Income | $863,832.98 | $894,587.94 |

| Description | 2005 | 2006 |
|---|---|---|
| Total Deposits | $1,899,028.57 | $2,282,322.20 |
| - Non-Income Deposits and Items | ($690,844.54) | ($928,310.94) |
| = Gross Income | $1,208,184.03 | $1,354,011.26 |

(See, PSR Exhibit 1 Doc 120-1, Jenkins Decl. ¶ 11, Defense Exh. BB)

With the starting point of the tax loss calculation in agreement, disagreement is narrowed to three issues:

(1) whether the approved Bank Deposits Method or the government's proposed *ad hoc* method should be used to calculate the tax loss;

(2) whether non-taxable deposits of Sandor Bartok are taxable income to defendant Samuel Klein; and,

(3) household cash wages in 2005 and 2006.

As discussed below, the recognized, accepted, authorized Bank Deposits Method should be followed and Sandor Bartok's non-taxable deposits are not the taxable income of his nephew Samuel Klein. As to the household wages, the government's Gross Income calculation already includes $100,776.99 of cash

withdrawals in 2006 from which the wages were paid. (Exh AA, p. 4; Doc. 128-27, p. 5 of 7.)

**2. Bank Deposits Method Not Followed By Government or PSR.**

The government asserts that it relies upon the recognized Bank Deposits Method to circumstantially determine unreported taxable income. (Opp. at 11:18-20; Jenkins Decl. 3:23-26.) IRS-CID Special Agent Jerome Jenkins testifies, however, that the government has "truncated" the Bank Deposits Method in arriving at the government's tax loss calculation. (Jenkins Decl. at 4:8-14.) The government "truncates" the Bank Deposits Method in at least two significant respects, so much so that it can no longer be recognized as the Bank Deposits Method.

First, the government's truncated *ad hoc* formula does not determine "unreported *taxable* income," but rather "unreported *total* income." (Decl. Jenkins 4:17-18) This modification is extraordinary because one of the most basic tenets of taxation in the United States is that income tax is calculated on *taxable* income, not on *total* income. (See, 26 U.S.C. § 63.)

Second, another significant modification or "truncation" is that the government formula does not allow deductions for all business expenses, only business expenses reported on filed income tax returns. (Jenkins Decl. at 5:2-4.) The Bank Deposits Method, however, requires that all business expenses be allowed, except those definitely provable as being nondeductable. The government's calculation does not consider business expenses that are required to be deducted when using the Bank Deposit Method of proving income as detailed in the special agent's handbook and training manual. (Knudson Decl. 4:3-6, Exh. B.)[3]

A simple comparison of the Bank Deposits Method with the government's

---

[3] The Declaration of Carl Knudson previously filed as Document 128-26 with defendant's Sentencing Position, appears incomplete. A correct copy of the Declaration with Exhibits A and B is filed with this Reply at Exhibit NN.

proposed "truncated" formula, shows that the government is using a truncated, unrecognized, *ad hoc* method without any authority, and not the recognized Bank Deposits Method. (See, Jenkins Decl. ¶¶ 4,5; Knudson Decl., Exh. B; Proposed Jury Instruction, Exh. II.)

Special Agent Jenkins actually states, "Since the bank deposits method of proof computes "unreported taxable income" and not "unreported total income," the formula used by the government in trial was truncated. . ." (Jenkins Decl. 4:10-14.) In other words, "Since the Bank Deposits Method does not result in the tax loss the government wants, the government made up its own truncated formula to arrive at the desired tax loss."

The government and PSR calculation of the tax loss fails to follow any recognized method of calculating tax loss.

**3. <u>The Government's Tax Calculation Does Not Comply with the Sentencing Guidelines</u>.**

The government's tax loss calculation is truncated and incomplete because the government's tax case was still a "work in progress" even after trial started. (*See* Motion *in Limine*, Exh. LL (the trial settled before any ruling on motions *in limine*).) Two days before trial, the government advised the defense that the draft calculations of unreported income "remain a work in progress due to the ongoing updating taking place because of the rolling production of bank records." (Id.) As of January 3, 2011, the government had not produced to the defense its completed Bank Deposits Method analysis, their criminal tax calculations, their tax expert IRS Agent George Beas 's opinions[4], nor the bases underlying the experts opinions. (See,

[4] The defense objected to Mr. Beas' lack of qualifications and because his comments on the propriety of specific unidentified deductions and specific unidentified items of income, essentially conducting a civil tax audit during a criminal tax trial. (Motion in Limine, Exh. MM)

Motion *in Limine,* Exh. MM.) Even after trial started, voluminous records of disbursements from more than a dozen bank accounts over four years were being produced to the defense.

After the trial, the government's proposed tax expert trial witness, IRS Agent George Beas, presented a draft chart that generally followed the Bank Deposits Method, but which was incomplete because bank records of disbursements and expenses had not been included. (See IRS Chart, Exhibit AA.) Special Agent Jenkins was present at the meeting on January 27, 2011, which included Mr. Beas, and defense tax expert Carl Knudson. Contrary to SA Jenkins' representation in his declaration (Jenkins Decl. 5:7-9), Mr. Beas' analysis was not the final version for purposes of trial; it was still a work in progress. Shortly after the meeting, Mr. Beas retired and could no longer be reached to discuss the calculations. If Mr. Beas analysis was the completed final version for trial then why does SA Jenkins propose a "truncated" version that departs from the recognized method and his own IRS training. (Knudson Decl. ¶12, Exh. B.) The reason is that as bank records of disbursements and expenses became available during trial and after, it became clear that the required allowance of business expenses under the Bank Deposits Method would reveal little or no tax loss. (Knudson Decl. ¶¶ 12-14; Exh. BB.) The government "truncated" and stopped its work because to go further would prove that there is little or no tax loss.

Rather than complete their calculation of unreported income using the recognized method, the government abandoned its effort and improperly seeks to shift its burden to Mr. Klein. The government tries to misdirect attention with an almost stereotyped caricature of Mr. Klein's avarice and cunning and a litany of every possible sin he may have committed over the past decade.

Under USSG §2T1.1(c)(1), the government is required to establish "the total amount of loss that was the object of the offense (*i.e.*, the loss that would have resulted had the offense been successfully completed)." This requires the

government to establish the amount of tax evaded on any unreported *taxable* income, not "unreported *total* income." (26 U.S.C. § 63, defining "taxable income.")

USSG §2T1.1(c)(1)(A) states, "If the offense involved filing a tax return in which gross income was underreported, the tax loss shall be treated as equal to 28% of the unreported gross income (34% if the taxpayer is a corporation) plus 100% of any false credits claimed against tax, unless a more accurate determination of the tax loss can be made." (emphasis supplied.) In this case, the more accurate determination of the tax loss is the recognized Bank Deposits Method. The omitted business expenses are not speculative but are documented by the bank records of disbursements that were produced by the government during and after trial.

In *United States v. Spencer*, 178 F.3d 1365 (10th Cir. 1999) the defendant undertook a scheme to pay his employees approximately one-half their wages in the form of untaxed per diem or mileage reimbursements and did not report the diverted income. Defendant pled guilty to the charges of conspiracy to defraud, aiding and assisting in the preparation of false and fraudulent tax returns, and subscribing to false and fraudulent tax returns. Defendant appealed his sentence claiming that the district court erred in applying the sentencing guidelines by improperly relying on the guidelines' presumptive tax rates and failing to attribute the tax loss from diversion of income to deductible officer compensation or embezzlement loss. The court found that defendant's speculation and conclusory allegations did not suffice because he failed to identify any specific records from which a more accurate tax loss determination could have been made. (*United States v. Spencer*, 178 F.3d at 1367.) In this case, the specific records from which a more accurate tax loss determination can be made are the bank records produced after the commencement of trial and the government's partial Bank Deposits Method calculation. With its Sentencing Position, the defense presented Exhibit BB, which completes Mr. Beas' draft calculation. Exh. AA, by adding the required business expenses omitted on filed returns in 2003 and unfiled tax returns in 2004, 2005, and 2006. Set forth

below is an updated calculation that complies with the Bank Deposits Method.

The government also misstates *United States v. Yip*, 592 F.3d 1035, 1041 (9th Cir. Haw. 2010), which did not modify or even concern the Bank Deposits Method. In applying USSG §2T1.1 to the defendant's claim to a deduction for unpaid state income taxes, the court stated:

> In Defendant's case, he cannot even argue that the state taxes are legitimate, but unclaimed, deductions. The state taxes are not legitimate deductions <u>because he did not pay them</u>. A cash-basis taxpayer may deduct state and local taxes "for the taxable year within which paid." 26 C.F.R. § 1.164-1(a). The district court properly refused to reduce the tax loss attributed to Defendant to account for an imputed deduction from his unpaid state taxes.
>
> (*United States v. Yip*, 592 F.3d at 1041 (emphasis supplied.)

Here, Mr. Klein is not seeking deductions for state taxes that he did not pay, but for business expenses that he did pay. Under USSG §2T1.1, *United States v. Yip, United States v. Spencer,* and the Bank Deposits Method, the government cannot ignore deductions for business expenses that were actually paid and are supported by bank records and documents in the governments possession.

**4. <u>Uncle Sandor Bartok.</u>**

The government's accusations of theft, fraud, and regulatory violations concerning Sandor Bartok are beyond the pale. Mr. Sandor Bartok was Samuel Klein's uncle, the brother of his mother Rachel Friedman Klein and the son of Imre Bartok and Vera Friedman born in Hungary. (See Sandor Bartok Certificate of Death, Exh. KK.) There was nothing unlawful or improper about Mr. Klein's actions to assist his disabled uncle in obtaining and managing his benefits while he was bedridden during his final years, and any deposits are more than offset by the cost of care. Mr. Klein took care of his uncle, was his uncle's guardian *ad litem* in

the workers compensation action, and was his uncle's durable power of attorney as reflected in documents in the government's possession. (Bates K081058, K081672) Mr. Klein was never the licensee of Genesee Royal (See, Lower Decl. Exh. 58, Bates K00109850) and Genesee Royal did not operate after 2002 (Opp. 18:22-23); the California Code of Regulations and the Probate Code are irrelevant.

The government is correct in only one aspect; that the insurance company was "also was required to pay Mr. Bartok's medical and living expenses," which is what they did, knowing that M. Klein was a family member. (Opp. 16:16-17; See Bates K080851) The government's effort to paint Samuel Klein and Zipora Klein as villains even for the acts of caring for a severely disabled family member does not serve truth, but is inflammatory and offensive. Of course the Kleins took care of Uncle Bartok's finances; Sandor Bartok was bed-ridden, required around the clock care and monitoring, and later became "brain-dead." (Opp. 18:13-14.) None of the payments made to Sandor Bartok, or for his medical and living expenses, are the income of Samuel Klein. The payments are non-taxable benefits of Sandor Bartok due to his injury and disability.

**5. Bank Deposits Method of Proving Income.**

The Bank Deposits Method formula is set forth below. (See Proposed Jury Instruction Exhibit PP; Decl. Jerome Jenkins 4:1-8; Decl Knudson, Exh. B.) :

Total Deposits
- Non-Income Deposits and Items
= Gross Income
- Business Expenses
= Adjusted Gross Income
- Itemized Deductions and Exemptions
= Taxable Income (Corrected)
- Reported Taxable Income
= Additional Taxable Income for Criminal Purposes

The Additional Taxable Income for Criminal Purposes is then multiplied by

by the Tax Rate of 28% to give the Tax Due and Owing for Criminal Purposes.

Proof of unreported income by the bank deposits method alone is sufficient. It is not necessary to use another method of proof as corroboration. (*United States v. Stein*, 437 F.2d 775, 779 (7th Cir. 1971.)

None of the spreadsheet exhibits or calculations previously filed in this case calculate the tax loss by use of the correct Bank Deposits Method formula, including defense Exhibit BB.

**6. Defendant's Bank Deposits Method calculation.**

Defendant Samuel Klein previously revised the government's draft calculation, Exhibit AA, to include business expenses actually paid. Neither Exhibit AA nor Exhibit BB, however, followed the correct Bank Deposits Method formula set forth above. Following the formula, with updated business expense items, results in no under reporting on income over the period 2003 to 2006 as a whole, however, there is a tax loss of $17,701 in tax year 2003 as follows:

| | 2003 | 2004 |
|---|---|---|
| Total Deposits | $ 2,083,337.23 | $ 1,761,656.70 |
| - Non-Income Deposits and Items | $ (1,219,504.25) | $ (867,068.76) |
| - Non-Income Sandor Bartok Deposits | ($69,134.60) | $ (69,200.76) |
| = Gross Income (Schedule B) | $ 794,698.38 | $ 825,387.18 |
| | | |
| - Business Expenses (Schedule F,G) | $ (639,675.00) | $ (775,200.00) |
| = Adjusted Gross Income | $ 155,023.38 | $ 50,187.18 |
| | | |
| - Itemized Deductions and Exemptions | $ (80,186.00) | $ (74,760.00) |
| = Corrected Taxable Income | $ 74,837.38 | $ (24,572.82) |
| | | |
| - Reported Taxable Income | $ (11,620.00) | $ (29,251.00) |
| = Additional Taxable Income | $ 63,217.38 | $ (53,823.82) |
| Tax Rate 28% | 28% | 28% |
| =Tax Due and Owing | $17,700.87 | ($15,070.67) |

| | 2005 | 2006 |
|---|---|---|
| Total Deposits | $1,899,028.57 | $2,282,322.20 |
| - Non-Income Deposits and Items | ($690,844.54) | ($928,310.94) |
| - Non-Income Sandor Bartok Deposits | ($69,320.76) | ($40,627.90) |
| = Gross Income (Schedule B) | $1,140,868.27 | $1,313,383.36 |
| | | |
| - Business Expenses (Schedule F,G) | $ (1,087,572.00) | $ (1,221,688.00) |
| = Adjusted Gross Income | $ 53,296.27 | $ 91,695.36 |
| | | |
| - Itemized Deductions and Exemptions | $ (86,338.00) | $ (96,826.00) |
| = Corrected Taxable Income | $ (33,041.73) | $ (5,130.64) |
| | | |
| - Reported Taxable Income | $ (12,017.00) | $ (18,041.00) |
| = Additional Taxable Income | $ (45,058.73) | $ (23,171.64) |
| Tax Rate 28% | 28% | 28% |
| =Tax Due and Owing | ($12,616.44) | ($6,488.06) |

The complete chart is attached and filed as Exhibit OO. Following the Bank Deposits Method, a recognized and accurate method of calculating unreported income and resulting tax loss for sentencing purposes, shows a negative unreported income of -$58,836.51 for the 2003 to 2006 period, and a tax loss for 2003 of less than $20,000.

7. **Other Related Conduct.**

While Mr. Klein acknowledges that under *United States v. Williams*, 217 F.3d 751 (9th Cir. 2000), the Court *may* consider as relevant conduct acts that would otherwise be barred from prosecution by the applicable statute of limitations, he submits that it is inappropriate to consider such acts here. The uncharged acts occurred in some cases more than ten years ago, rendering Mr. Klein's ability to investigate the allegations, review the evidence, interview witnesses, etc. extremely difficult, if not impossible. Below are responses to some of the statements:

| Statement | Response |
|---|---|
| No records for the bank account in Israel (Jenkins Decl. 5:27-2) | The "missing" Bank Leumi records are government trial exhibits 423 and 432, with English translations |
| Government did not include as income the deposits to defendants' bank account in Israel. (Jenkins Decl. 10:102) | The deposits cannot be included as income. The deposits are non-taxable transfers from Mr. Klein's U.S. bank account to cover the losses on the rental apartment in Jerusalem. |
| The Kleins' consistently under-reported their income to the IRS from at least 2003 through 2007 so as to fund their lifestyle and $3 Million home. (Opp. 4:8-12.) | Very little, if any, under-reporting of *taxable* income occurred. Where Mr. Klein omitted income, he also omitted business expenses. The Klein's lifestyle was largely funded by refinances and the sale of a property. (See Hodges Decl., Exh A.) The $3 Million home was purchased in 1998 for $950,000 |
| Jesus Quezada declaration (pg 24 line 18), " spreadsheet summarizing 102 petitions associated with Chabad Israel Center in Los Angeles" | The vast majority of those petitions were made by Rabbi Yemini and his lawyer, Raphael Rose (who is now deceased). |
| $1.2 million dollars in cash was deposited in the Klein's bank accounts from 2003 through 2006. (Opp. 7:1-4.) | True. Represents about $25,000 a month from tenants over 48 months as well as revenue from Smartax/Startax. Running cash transactions through bank accounts is more indicative of a legitimate business than tax fraud. |
| Defendants previously testified under oath that they bought their home but subsequently transferred it away to absolve a debt. (Opp. Fn 4) | Statement taken out context and misstates the record. Govt's cited transcript jumps from page 300 to 302; Govt's Exh 69 skips four pages of testimony. Deposition of Samuel Klein over seen by retired Superior Court Judge Eli Chernow, presiding as discovery referee. |
| Federal income and payroll taxes paid on wages without "salary" checks in the bank records. (Opp. 13:14-17 | Reporting personal expenses as wages or clearing loan to shareholder account as wages at year end is not an uncommon practice for small corporations. Govt. faults Mr. Klein even when he pays taxes and reports income. |

**8. Mr. Klein Did Not Fail to Report the Source of Illegal Income.**

The government argues that an enhancement under U.S.S.G. §2T1.1(b)(1) applies because, by under-reporting his total income, Mr. Klein failed to report at least $10,000 of criminally derived Smartax/Startax income. (Opp. at 20.) This enhancement can only apply if the government shows that the income Mr. Klein failed to report was income from the visa preparation business (Smartax/Startax) and that it was $10,000 or more in income generated from the discrete number of fraudulent visa applications.

Mr. Klein filed a corporate return in 2003, but did not file corporate income tax returns in 2004, 2005, and 2006. For all years 2003 through 2006, however, Mr. Klein reported his net income from the Smartax/Startax corporation as wages on Federal Form 941 and reported the income on his Federal Form 1040, personal income tax return.[5] Thus, the enhancement does not apply because he did not fail to report the income he derived from preparing visas. Even if the Court found that some of the under-reported income was from Startax/Smartax, the government cannot show that the under-reported income was derived from the fraudulent visa applications (*i.e.* the I-360s), as opposed to the lawful visa applications (*i.e.* the I-539s).[6]

**9. Mr. Klein Did Not Use Sophisticated Means to Commit the Tax Offense**

The government claims that Mr. Klein used sophisticated means because (a) he failed to file tax returns and when he later filed returns they were complicated; (b)

---

[5] Mr. Klein's failure to file corporate returns in 2004, 2005, and 2006, had no tax consequences because Mr. Klein reported the net income as wages on his federal form 1040. This is not the offense Mr. Klein is convicted of.

[6] As discussed, *infra*, the government grossly over-estimates the number of fraudulent visa documents and how much Mr. Klein charged to prepare them.

he filed personal returns but not corporate returns and changed Employer Identification Numbers ("EIN"); and (c) he put LLCs in the names of the properties they dealt with. (*See* Opp. at 6, fn. 6 and at 22-25.) Each of the examples the government provides to argue that Mr. Klein used "sophisticated means" are common business practices.

First, the fact that when Mr. Klein filed tax returns they were complicated does not indicate *he* used sophisticated means - it just shows that compliance with filing requirements and preparation of income tax returns is complicated. Mr. Klein ought not to be penalized because of the complexities of tax laws and tax rules. In fact, the filed tax returns show sloppiness that harmed Mr. Klein more than the U.S. Treasury. For instance in 2003 tax year alone, Mr. Klein left $54,439 in depreciation expenses off his 2003 Form 1040, and failed to account for $83,648 in government filing fees and $9,453 in payroll taxes on the corporation return. Mr. Klein has also failed to report depreciation on 501 N. Orange, to Mr. Klein's detriment in the amount of more than $100,000 in 2004 through 2006, which is not yet included in Exhibit OO..

Second, Mr. Klein's use of different Taxpayer Identification Numbers for different entity's is not evidence of sophistication. Mr. Klein did what he was legally required to do: he obtained different identification numbers when he changed the form of his company. Attached as Exhibit FF are printouts from the California Secretary of State which show that in 2002 the business was "Smartax Associates", which was an S-Corp (suspended), in 2004 the business was changed to "Smartax" , a "C-Corp" (suspended), and in 2006 the business was changed to "Startax Inc." (suspended). Contrary to the government's claims, the business did change form, as each of the three business entities had their own articles of incorporation and received new charters from the California Secretary of State. According to the IRS official website, "Generally, businesses need a new EIN when their ownership or structure has changed. . . . You will be required to obtain a new EIN if any of the

following statements are true. A corporation receives a new charter from the secretary of state.. . ." (*See* Exhibit GG.) And, even though new federal EINs were required, Mr. Klein was not required and did not obtain a new employer number from the California Employment Development Department ("EDD").

Finally, as discussed in his sentencing position, it is also standard business practice to place individual properties in their own LLC or other business entity for liability purposes. The government puts a negative spin on even the most innocuous business practices.

**10. <u>Mr. Klein Did Not Use Special Skill in the Preparation of His Taxes.</u>**

It requires no special skill to fail to file one's own tax returns or fail to report all gross income and expenses on filed returns. Indeed, the errors here may reflect carelessness and lack of skill instead of special skill. As shown above, even the filed returns and the failure to file worked to Mr. Klein's disadvantage and show inadvertence and sloppiness, not skill or sophistication. Mr. Klein took a correspondence course and filed a bond to become a tax preparer, that is all.

**11. <u>Mr. Klein Did Not Obstruct Justice During The Tax Investigation</u>**

The government first claimed, in its Objections to the PSR, that Mr. Klein obstructed justice by "his submission of a willfully false tax return for 2007 after learning of the government's investigation." (Govt. Obj. at 3:16-17.) Now, in addition to Mr. Klein's 2007 tax return, the government argues that Mr. Klein submitted a perjurious declaration to this Court. (Opp. at 27, 29-31.)

An enhancement for obstruction of justice applies, "If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the

defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense . . ." U.S.S.G. §3C1.1. Although the government argues that "a broad range of conduct can constitute obstruction of justice" (Govt. Obj. at 3 and Opp. at 27, citing *United States v. Dota*, 33 F.3d 1179, 1190 (9th Cir. 1994)), the Ninth Circuit has more recently held that "for the obstruction of justice enhancement to apply, the district court *must* find that the defendant *willfully* provided a materially false statement to law enforcement officers that *actually* obstructed or impeded the official investigation or prosecution of the instant federal offense." *United States v. Luca*, 183 F.3d 1018, 1022 (9th Cir. 1999)(emphasis added), noting U.S.S.G. §3C1.1 & n. 3(g) and *United States v. Solano-Godines*, 120 F.3d 957, 963-64 (9th Cir. 1997).

In *United States v. Yip,* 592 F.3d 1035 (9th Cir. 2010), the only tax case and one of only two Ninth Circuit cases that the government cites in its Objections to the PSR, the obstruction of justice enhancement applied on a very different set of facts. As described in Mr. Klein's Sentencing Position, based on Ninth Circuit authority, including *Yip*, the sophisticated means enhancement does not apply here. Mr. Klein's 2007 tax return, even if incorrect, does not constitute obstruction of justice because the government has not shown that the alleged false statement was made willfully (as opposed to inadvertently) and that it actually obstructed or impeded the investigation and prosecution of the instant case.

In fact, when the items the government complains were omitted (with the exception of payment for Uncle Bartok), the adjustment was in Mr. Klein's favor.

The government now also alleges that Mr. Klein obstructed justice by submitting a "perjurious declaration," because he stated that his wife was not involved in the preparation of tax returns, did not have the knowledge to evaluate the couples' tax liability and did not have management or control over the investment properties. (Opp. at 27, 29-30.) That Mrs. Klein may have been an officer of Smartax does not *ipso facto* make her involved in the preparation of returns or

knowledgeable about the tax liability. Nor did Mrs. Klein have control over the investment properties, a fact of which the government is amply aware. Not only do the government's exhibits *not* support its contention (*see, e.g.*, Govt. Ex. 46 (witness Buchwalter describes extensive dealings with Mr. Klein and one or maybe two interactions with Mrs. Klein)), but the government fails to acknowledge that its own agents, dispatched to interview individuals who submitted letters on behalf of the Kleins for this sentencing proceeding, interviewed Jason Dmuchoski who stated that he "has seen Sam often when Sam Klein checks on properties or to talk with Jeff [the property helper]" but he "rarely sees [Mr. Klein's] wife" and does not even know her name. (*See* handwritten notes of meeting with Jason Dmuchoski by Agents M. Reyes and K. Lower, attached as Exhibit II.) In the agents' notes, Mr. Dmuchoski also stated that he "100% backed" the letter he wrote. (*Id.*; *see also*, handwritten notes of meeting with Jeffrey Page Horne by Agents M. Reyes and K. Lower, attached as Exhibit JJ (he was "aware of the investigation," "wrote letter in respect to Sam," and had "no guidance on whats on letter").)[7]

**B. THE VISA FRAUD OFFENSE**

**1. <u>Mr. Klein Did Not Submit More than 100 Fraudulent Visas</u>**

The government grossly over-estimates the numbers of fraudulent immigration documents. The government argues that "[m]ore than 900 immigration filings prepared by defendant were fraudulent simply because they did not list the actual addresses of defendant's client, but instead used New York addresses associated with the Klein's [sic] children." (Opp. at 31.) Agent Jesus Quezada, an

---

[7] The government insinuates that the Kleins' close-knit Jewish community, who in large part comprise the individuals who wrote letters on the Kleins' behalf, are the only individuals the Kleins are generous towards. (Opp. at 40.) Then the government apparently chose to interview two non-Jewish individuals who wrote letters on the Kleins' behalf.

ICE Agent, declares that it is his "understanding that accurate information, including address information, also is important to USCIS in evaluating the merits of a petition." (Opp. at 31, *citing* Quezada Decl. ¶ 2.)

Materiality is a requirement of visa fraud, and "[a] statement is material if it is capable of affecting or influencing a governmental decision." *United States v. Matsumaru*, 244 F.3d 1092, 1101 (9th Cir. 2001). As noted in his Sentencing Position, most of the visa petitions Mr. Klein submitted were for I-539 tourist visas. (Sent. Position at 30.) Such applications are used for people temporarily visiting the United States, and usually the applicants do not have a permanent address in the country. The use of New York addresses on the I-539 petitions was a convenience to Mr. Klein's customers, as many of them did not have permanent addresses or were traveling from the West Coast to the East Coast and an East Coast address made it easier to pick up the receipt from immigration. Moreover, one agent's declaration about what another agent told him he overheard one day is not reliable evidence. (Opp. at p. 5, fn. 5.) Most significantly, *the address line on the I-539 petition is not a material statement.*

Finally, contrary to the government's assertion, each petition is not a separate "document" within the meaning of U.S.S.G. §2L2.1(b)(2)(c). (*See* Govt. Opp at 33:3-7.) The government cites to *United States v. Badmus*, 325 F.3d 133 (2d Cir. 2003) to support its argument that each petition is counted separately. However, a reading of *Badmus* reveals that it supports Mr. Klein's position. In *Badmus*, the Second Circuit stated:

> When the district court interpreted the application note as applying to a set of documents "intended for a *single* use by a single person," the court did not mean "a *one-time* use." Rather, it interpreted the application note as applying to a set of documents that would be used, together, by one person, for a single purpose. Thus, an individual might have a 'set' of fraudulent immigration papers—including a counterfeit

passport, phony green card, and forged work papers—for use in establishing a particular false identity in the United States. Under application note 2, these 'multiple documents [which] are part of a set of documents intended for use by a single person' would count as only one document. They would continue to constitute only one document even if used many times, by one individual, to perpetuate the same false identity fraud. This is so because the *number of documents* in each set is unrelated to the number of false identity scams; and all of the documents can be used together "as a set" to bring about the scam or scams. This was the district court's understanding, and it is the most straightforward interpretation of the application note's text.

*Id.* at 139-140 (Emphasis in original).

Many of the visas Mr. Klein submitted require multiple petitions submitted in one package. (*See* Opp., Quezada Decl. ¶¶ 4, 5.) As the chart below illustrates, depending on the type of visa, the document was either filed alone or concurrent with other documents.

| Visa | Name | Form filed concurrently |
|---|---|---|
| I-129 | Application for non immigrant visa -for religious worker or other worker | No other forms included |
| I-130 | Petition for spouse | File concurrent with I-131(travel document), I-485 (application of permanent residency), I-765 (employment authorization) |
| I-131 | Travel document | |
| I-140 | Immigrant worker | File concurrent with I-131(travel document), I-485(application of permanent residency), I-765 (employment authorization) |

| | | |
|---|---|---|
| I-360 | Abused spouse | File concurrent with I-131(travel document), I-485 (application of permanent residency), I-765 (employment authorization) |
| I-360 | Religious worker | No other forms included |
| I-485 | Application of permanent residency | |
| I-539 | Tourist visa extension | No other forms included |
| I-765 | Employment authorization | |

For example, the I-130, I-140 and I-360 (Abused spouse) seek permanent residency (a green card), which usually takes several months. In order to achieve this, the I-485, I-131, and I-765 forms should also be filed concurrently with these petitions. By filing only the I-130, I-140 and I-360 (Abused spouse) and not the I-485, I-131, and I-765 concurrently, the permanent residency request is delayed indefinitely. In order to do the best service for a client, all forms must be filed concurrently. Of course, even though there is one applicant, there are technically four different applications and case numbers associated with the applicant's filing. However, these documents are more readily described as a "set of documents" because they seek the same goal: permanent residence and the attendant benefits. The government counted each visa application separately, which over-estimates the number of total filings.[8]

2. **Mr. Klein Did Not Abuse His Clients' Trust**

Mr. Klein does not have any special skill or license, nor did he hold himself

[8] As an example, Mayer Matan Yehuda filed 1-130 concurrently with I-131, 1-485, and 1-765. (See, Govt Trial Exhibit 478, 4929 Wilshire Boulevard address, p. 1 ln. 89 (I-130); p. 3 ln 180 (I-131) , p. 6 ln 306 (I-485), p. 10 ln. 481 (I-765)). Mayer Matan Yehuda filed one petition, but is counted as four.

out as possessing special or unique skills with which he could abuse his clients' trust. Under the government's reasoning, any business person would hold a position of trust. Mr. Klein did not assure or guarantee any clients of any outcome of their petitions.

### C. THE FALSE STATEMENT TO THE DEPARTMENT OF EDUCATION OFFENSE

The government claims that a four level enhancement applies under U.S.S.C. §2B1.1(b)(1)(C) because the loss from the false statement on the federal student loan document was more than $10,000 but less than $30,000. (Opp. at 34-35.) Mr. Klein contends that there was no actual loss because the Pell Grant[9] was never disbursed. Nor has the government provided *any* evidence which would show intended loss of more than $10,000 related to the offense of conviction. As such, the enhancement does not apply.

### D. MR. KLEIN IS CONTRITE AND HAS TAKEN RESPONSIBILITY

The government's sentencing memorandum reflects its obvious disdain for Mr. Klein. However, just because the government does not like a particular defendant, does not mean that defendant should be treated more harshly than another similarly situated defendant. Mr. Klein and the government had significant disagreements about the facts in this case leading up to trial and continue to disagree

---

[9] Mr. Klein's counsel erroneously referred to the Pell Grant as a loan in the Sentencing Position. (Sent. Position at 31; Declaration of Melissa A. Weinberger.) Furthermore, Mr. Klein's counsel asserted that Mr. Klein intended to repay "the loan." (*Id.*) While Mr. Klein's counsel did ask Mr. Klein if he would have repaid a loan had one been disbursed (to which Mr. Klein replied in the affirmative), counsel acknowledges that the financial aid form was for a Pell Grant and not a loan. (Declaration of Melissa A. Weinberger.) Thus, the argument that "the loan" would be repaid was mis-placed.

in several areas. Yet, the parties reached a resolution, agreeing that they could argue their respective sentencing positions to the Court. Nonetheless, after advocating for several additional enhancements that the USPO does not include, the government chastises Mr. Klein for setting forth his position, implying that by disagreeing with the government, Mr. Klein has not accepted responsibility. Mr. Klein does accept responsibility. He acknowledges his wrongful conduct and looks forward to moving on with his life.

## III.

## CONCLUSION

For the reasons set forth above, Mr. Klein respectfully requests that this Court impose a sentence of probation with house arrest and/or community service.

LAW OFFICES OF MARK J. WERKSMAN

Dated: July 25, 2011 By: ______________________

Mark J. Werksman
Mark M. Hathaway
Melissa A. Weinberger
Attorneys for Defendant
Samuel Klein